EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* WILFREDO LASTRA SÁEZ, acusado y apelante.

*Número:* CR-66-11      *Resuelto:* 27 de enero de 1967

*Edna Abruña Rodríguez,* abogada del apelante; *J. B. Fernández Badillo, Procurador General,* y *Américo Serra, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

El apelante Lastra Sáez fue convicto de dos delitos de escalamiento en primer grado. Fue sentenciado a las penas de uno a cuatro años de presidio. Los casos se vieron conjuntamente por tribunal de derecho luego de haber renunciado el apelante a su derecho a juicio por jurado. Apunta que dicha convicción se basó en una confesión que hizo inducido al confrontársele con ciertas prendas y dinero obtenidas con motivo de su detención ilegal y el registro ilegal de un bulto que llevaba. No tiene razón, de acuerdo con la prueba que aparece del récord y las conclusiones legales que se justifican de la misma y que pasamos a exponer.

A las once de la mañana del día 25 de diciembre de 1964, se recibió en el cuartel de la policía del pueblo de Naranjito

una llamada telefónica procedente de la policía del pueblo de Barranquitas. Como consecuencia de esa llamada, se ordenó al agente del orden público Zacarías Albino Ibarra, quien estaba de servicio en Naranjito y se encontraba en el cuartel de ese pueblo cuando se recibió la llamada, que detuviera el auto tablilla PA-243-186. Se le dijo "que en ese carro viajaba un individuo que se requería para investigación; que en ese carro caminaba Wilfredo Lastra Sáez y el chófer era Cristóbal Colón;" y que "la policía de Barranquitas quería ver a Wilfredo Lastra Sáez." Dicho policía se dirigió hasta la *entrada* del pueblo de Naranjito a esperar que pasara el automóvil. Testificó que:

"A la salida del pueblo en el kilómetro 6.5 vi que el auto venía, detuve la patrol y mandé a detener el vehículo, cuando este joven [Lastra Sáez] que viajaba en el lado derecho . . . abrió la puerta y se tiró con idea de correr y yo me tiré de la patrol y lo agarré por un brazo y lo detuve . . ."

"Le dije que me acompañara al Cuartel para una investigación sobre un escalamiento que sucedió en Barranquitas. Allí mismo le pregunté si conducía paquetes dentro del carro y me negó y entonces el chófer me dijo a mí que sí, que había un paquete . . ."

" . . . y él mismo [el acusado] acetó [*sic*] que era un paquete de ropa. Abrieron el baúl él y el chófer y busqué y lo que había era una suma grande de dinero."

"En el paquete había vellones de diez, de cinco, medios pesos, pesos gordos y dos relojes."

A la pregunta del fiscal sobre si él [el policía] había hablado con el acusado en relación con lo que había visto en el paquete, el agente replicó que:

"En el mismo instante de ver el paquete, y me dijo que pertenecía a un tal Panchito, que lo había sacado [se refiere al dinero] del negocio de un tal Panchito, que ahorá sé que es Francisco Berríos."

Fiscal: "¿Además de hablarle del dinero, le habló de alguna otra cosa?"

Policía: "Que ese reloj era del señor Francisco, que estaba en el negocio del señor Francisco. Además, el reloj de una señora, que no recuerdo bien el nombre, está en la Sala ahora, que lo había sacado la misma noche esa que se había llevado el dinero de ese negocio."

Una vez que el policía vio lo que había en el paquete, procedió a:

"Lo conduje al Cuartel; cogí la bolsa y la llevé al cuartel y llamamos a la Policía de Barranquitas y le dijimos que habíamos detenido el vehículo. Entonces llegó el Policía Pantaleón Quiles y me conduje con él hasta Barranquitas."

"En el Cuartel de la Policía de Barranquitas el Policía Pantaleón Quiles, como este señor Panchito, Francisco Berríos, se quejaba de que faltaba dinero, el policía Quiles se fue a donde él y lo interrogó y él [el acusado] le informó que el dinero en billetes . . ."

"Lo que dijo Wilfredo Lastra al Policía Quiles frente a mí sobre el dinero que faltaba en billetes, porque yo lo que ocupé fue el menudo, entonces que el dinero que faltaba lo tenía la esposa de este señor Wilfredo Lastra y el Policía Pantaleón Quiles fue hasta la residencia del aquí acusado y trajo la otra cantidad de dinero que faltaba."

El juez de instancia dictaminó que el registro del paquete en cuestión, así como el de la residencia del apelante fueron ilegales y que el fruto de tales registros no era admisible en evidencia. Por otro lado, sostuvo que la defensa podía ofrecer prueba sobre si la confesión fue inducida por la confrontación del apelante con el dinero y las prendas de referencia.

A los fines de establecer que la confesión fue inducida por la confrontación de Lastra Sáez con el dinero y las prendas, éste testificó, en el examen directo, que:

"Sí, señor, inducido yo presté esa declaración.

"¿Por qué la prestó?

Inducido porque me mostraron esos objetos que habían sacado del carro en que yo me dirigía a mi casa, y me los mostraron frente a mí y declaré al ver tanta cosa y hasta una ropa interior

mía dentro de ese bulto, lo cual yo no metí dentro de eso porque yo no sabía nada de eso.

¿Usted declaró inducido al ver los objetos que le mostraron? Sí, señor.

¿Esa fue la única razón que medió para usted declarar eso? Sí, señor."

El fiscal, en su turno, preguntó:

"¿Entonces el Policía lo detuvo a usted cuando usted iba en el carro y en aquel momento no le mostró a usted las prendas, usted no las vio en ningún momento?

"No, señor.

"¿No sabe de dónde el Policía sacó las prendas, no vio de dónde las sacó, no sabe si estaban dentro del baúl del carro?

Por la declaración él dice que las sacó de ahí."

En cuanto a las prendas, el acusado manifestó que no sabía de quién eran. A la pregunta del fiscal de si las prendas le causaron algún temor, el acusado respondió:

R.—"Seguro, porque me estaban embollando, me querían embollar."

P.—"Por qué se dejó embollar?"

R.—"Porque pedí que me trajeran un abogado para declarar y me dijeron que no, que hablara y me hicieron así con una macana en la cara."

P.—"¿Y usted prestó declaración porque pidió abogado y no se lo nombraron?"

R.—"No me lo nombraron."

P.—"¿Esa fue la razón?"

R.—"No, señor, porque me mostraron las prendas."

El juez interviene y le pregunta al acusado:

P.—"Dígame, señor, yo quiero que usted me aclare esto: entonces cuando el policía hace el registro y abre el paquete, ¿lo abrió delante de usted?"

R.—"No, señor."

P.—"¿Usted no sabe dónde abrió el paquete el policía?"

R.—"En el Cuartel de Naranjito, atrás en un cuarto."

P.—"¿Entonces se lo trajo a usted abierto?"

R.—"No, él vino y me dijo: 'qué buen botín llevas.'"

P.—"¿No le mostró las prendas?"

R.—"No, señor, hasta que llegó al Cuartel de Barranquitas."

El juez continúa interrogando al acusado y pregunta:

P.—"¿Entonces usted llega al Cuartel de Barranquitas y en el Cuartel de Barranquitas ¿qué hizo el Policía?"

R.—"El Policía Albino no se presentó a la celda donde yo estaba, quien fue fue el guardia Quiles."

P.—"¿Qué hizo el guardia Quiles?"

R.—"Me dijo que me quitara la ropa para registrarme y yo accedí.

P.—"En cuanto al paquete."

R.—"El paquete no me mostraron nada."

P.—"¿Nunca le mostraron al paquete, ni en Naranjito, ni en Barranquitas . . . ?"

R.—"Sí, en Barranquitas."

P.—"¿En qué momento?"

R.—"Cuando me sacaron de la celda a que fuera a declarar."

P.—"¿Entonces cuando lo llevaron de la celda a declarar, dónde vio el paquete?"

R.—"Encima del escritorio . . ."

.        .        .        .        .        .        .        .

"Si alguno de los funcionarios le dijo a usted que este paquete se había ocupado en el carro" [Pregunta el juez.]

R.—" 'Se ocupó en el carro que tú ibas', me dijo el Policía Zacarías."

P.—"¿Y dónde vio usted el paquete antes de declarar?"

R.—"No estaba el paquete en sí, porque estaba todo derramado."

P.—"¿Qué vio usted?"

R.—"Yo vi dinero y prendas."

P.—"¿Usted dice que ese dinero y esas prendas usted en ningún momento las tuvo en su poder, o sea, que no sabía qué eran esas prendas ni a quién pertenecían?"

R.—"No, señor."

P.—"¿Tampoco sabía a quién pertenecía el dinero?"

R.—"No, señor."

P.—"¿Entonces cómo lo podían inducir a usted a declarar lo que declaró, cómo lo podía inducir el hecho de que le mostraron

una cosa que usted no tenía nada que ver y no·estaba conectado con usted?"

R.—"Porque a mí se me mandó a detener y la inducción fue porque me mandaron a detener."

P.—"¿Eso fue lo único que lo indujo a declarar?"

R.—"Y como que *me querían presionar, me presionaron demasiado."* (Énfasis nuestro.)

Sigue el juez con su línea de interrogatorio:

P.—"Para aclarar esta situación: al confrontarse con el paquete ése, con los objetos que había, el dinero y las prendas, unas prendas que no eran suyas, que no las había cogido ni puesto en ningún paquete, ni las llevaba con usted en el carro, ¿qué tenían que ver esas prendas y ese dinero con la declaración que usted presó [*sic*] si no tenía que ver con esas prendas?"

R.—"El *temor que no me fueran a agredir, porque me tenían en sus manos."* (Énfasis nuestro.)

P.—¿De manera que la confesión usted la prestó, no porque lo confrontaron con esas prendas, sino porque lo iban a agredir?"

R.—*"Por el temor."* (Énfasis nuestro.)

P.—¿"El temor a que lo agredieran?"

R.—"Sí, señor."

Anteriormente, a preguntas del fiscal, el acusado declaró que lo habían amenazado con una macana, que *pidió* abogado y no se lo nombraron y que con relación a las prendas:

" . . . y con las prendas no decían a cada lado: 'esto es tuyo'. '¿De quién es esto?', y yo estoy en un estado de nervios que estoy tratándome en siquiatría también; que no me pueden violentar mucho; yo intenté hasta matar a mi esposa, de tres meses de encinta, por una rabia que pasé."

Después de estos incidentes, el juez resolvió que:

"Así que en esas condiciones, y como resultado de la propia prueba del acusado de que el motivo por el cual él prestó la declaración no es que fuera inducido porque se le mostraran los objetos, el producto o fruto del escalamiento, por el Policía, sino que él dice que él es una persona nerviosa, que está en tratamiento siquiátrico, y que el Policía lo amenazó con la macana, que no le dejaban casi ni contestar y que por esa coacción ejercida por el

Policía él hizo la declaración, ahora el Fiscal tiene derecho a rebatir . . . esa prueba . . ."

El fiscal ofreció como prueba de refutación, y para establecer que la declaración prestada por el acusado fue voluntaria, al juez de paz, José Colón Santini. Éste declaró que hizo al acusado las advertencias legales, inclusive la de comunicarse con un abogado y obtener los servicios de éste; que el acusado le había expresado que quería declarar voluntariamente; que éste no presentaba huellas de golpe o cortadura o de que hubiese sido golpeado, agredido o estropeado ni se quejó de que lo hubiese sido. Explicó cómo tomó la declaración, así:

" . . . y según él iba haciendo su declaración, explicando cómo había entrado, penetrado en el negocio del señor Berríos, cómo había ido a la casa de la señora Meléndez, dónde había depositado el dinero, cómo había sido encontrado el dinero por la Policía de Naranjito, toda esa declaración que obra en poder del señor Fiscal, que iba explicando y el Policía tomando."

Manifestó el juez de paz que nadie más le hizo preguntas al acusado; que había gente del pueblo y estaban los testigos; que había alrededor de cuatro o cinco policías; que mientras lo iba interrogando le iba mostrando los objetos y él los iba reconociendo y decía qué había sucedido.

Al volver el acusado a declarar, afirma, a la siguiente pregunta del abogado defensor:

"¿Por qué razón, si usted no cometió esos escalamientos, usted firmó la declaración jurada?"

Por el temor de que cumplieran la promesa que habían hecho; como el juez no estaba y al ver que me dijeron eso y al ver que me vi con tanto problema, tanta cosa, me vi apretado y tuve que dar la declaración."

A preguntas del fiscal sobre:

"¿Entonces el motivo por el cual declaró fue por las amenazas que le hicieron los Policías?

Las amenazas y la prueba que me enseñó el Juez.

¿Si el Juez no le enseña eso, usted no declara?
Yo siempre hubiera declarado porque la había visto."

La confesión de Lastra Sáez, suscrita ante el referido juez de paz demuestra que a aquél se le hicieron las advertencias de no declarar y de que lo que declarase podía ser utilizado en su contra. Pero no demuestra que se le advirtiese de su derecho a tener asistencia de abogado durante el interrogatorio ni que él renunciase a ese derecho voluntaria e inteligentemente. Pasamos a exponer la referida confesión.

"Que en la madrugada del 25 de diciembre, como a las 3:00 A.M. penetré al establecimiento comercial del Sr. Francisco Berríos Concepción, ubicado en la calle El Río de Barranquitas, donde encontré una puerta abierta y de allí sustraje tres bolsas de papel conteniendo una cantidad de dinero en billetes de distintas denominaciones, la cual cantidad me llevé a mi casa cita en la misma calle El Río donde la deposité en un bolso plástico de color blanco sin saber la cantidad que había sustraído de dicho establecimiento. Que esta mañana como a las 9:00 A.M. vine hacia el centro del pueblo y tuve la intención de entregarle el dinero a su dueño, pero lo vi hablando con el policía Quiles y entonces opté por fletar un automóvil y llegar a la casa de mi mamá y venir con ella a resolver el caso amistosamente con Panchito. Que fleté el carro de Cristobal Colón Delgado y acompañado de mi esposa Ana María Alicea, me llevé el bolso plástico conteniendo el dinero, pero al llegar a Naranjito un policía detuvo el automóvil ocupando en el mismo el bolso conteniendo el dinero sustraído de la tienda de Francisco Berríos."

Pregunta el Juez de Paz:

"Entonces un reloj Bulova y una sortija con una piedra verde que yo le muestro a usted y que fue ocupada por el policía de Naranjito en el automóvil en que usted viajaba, ¿de dónde la sacó?

Respuesta: Esta la sustraje también con el dinero del negocio del Sr. Francisco Berríos."

Pregunta dicho juez:

"Entonces este reloj Bulova plateado de mujer que yo le muestro a usted ahora y que fue ocupado también por el policía

en Naranjito en el automóvil donde usted viajaba, ¿de dónde lo adquirió?

Respuesta: Penetré en la casa de la Sra. Elba Luisa Meléndez en la calle El Río por una puerta que encontra [*sic*] junta como a las 9:30 P.M. y de allí sustraje un reloj de mujer marca Bulova con su estuche plástico de color gris claro y también unos guantes de goma los cuales fueron ocupados por el policía de Naranjito en el carro que me transportaba a Bayamón."

Pregunta el juez de paz:

"¿En cuanto a este escalamiento que usted cometió en la casa de la Sra. Maléndez [*sic*] también usted se ratifica en que su declaración la hace libre y espontáneamente advertido de su derecho que como presunto acusado tiene de declarar o no de los hechos que se investigan y de la cual se le acusa a usted?

Respuesta: Sí, señor, declaro libre y espontáneamente estos hechos."

■ Sostiene la representación legal del apelante que la prueba demuestra que la confesión de éste surgió como resultado de la confrontación con las prendas ocupadas; que, conforme con la doctrina de *Pueblo* v. *Rodríguez Rivera*, 91 D.P.R. 456 (1964), eran inadmisibles en derecho. Por el contrario, el Procurador General indica que el apelante testificó que él confesó ante el temor de que lo fueran a agredir. Por otra parte, en su argumentación el Procurador General hace referencia al dinero y a las prendas que se le mostraron a Lastra Sáez en el cuartel de la policía de Barranquitas como "frutos del registro ilegal." No impugnó la conclusión del tribunal de instancia de que en efecto, tanto la detención de Lastra Sáez como el registro del bulto que llevaba en el automóvil fueron ilegales, es decir, en efecto que su detención constituyó un arresto que se realizó sin previa orden y sin motivo fundado para creer que Lastra Sáez había cometido un delito grave. El que se desease detener a Lastra Sáez para investigación significaba que se sospechaba de él. La mera sospecha no es la causa probable o motivo fundado que podía justificar su arresto. *United States* v. *Rabinowitz*, 339 U.S.

56 (1950). Por lo tanto, como consecuencia de ese dictamen no impugnado por el fiscal, las prendas y el dinero que uno de ellos encontró en el paquete localizado en el baúl del vehículo en que viajaba Lastra Sáez fueron ilegalmente obtenidos. Concluimos, sin embargo, que el apelante no estableció que su confesión fue inducida por la confrontación con el dinero y prendas obtenidas del registro en cuestión. *Pueblo* v. *Rodríguez Rivera*, supra.

El testimonio de Lastra Sáez sobre la motivación de su confesión fue contradictorio. Unas veces dijo que fue inducido porque le mostraron las prendas las que le causaron temor y en contrainterrogatorio testificó que confesó ante el temor de que lo fueran a agredir.

La prueba de que la confesión fue inducida por la confrontación con los "frutos" de un registro ilegal no tiene que establecer ese hecho fuera de toda duda. Sólo debe indicar que hubo una posibilidad razonable de que la evidencia objetada pudiese haber contribuido a la convicción. *Fahy* v. *Connecticut*, 375 U.S. 85, 86 (1963).

El haber sido inducido es el resultado de un estado de ánimo que es difícil de reproducir en toda su gama de reacciones pero que se exterioriza bastante perceptiblemente a base de los hechos o circunstancias ocurridas. La mera conclusión del acusado de que fue inducido no es suficiente. Pero en el caso ante nos el juez de instancia tuvo fundamentos sustanciales en la prueba para concluir que la confesión del apelante ante el juez de paz no fue inducida por la confrontación con el dinero y las prendas que se le mostraron. El apelante declaró que dichos artículos no eran de él ni sabía a quién pertenecían. Al preguntársele entonces cómo pudo inducirlo a confesar una cosa con la cual nada tenía que ver y que no estaba conectado con él, contestó que fue porque lo querían presionar, por el temor que la policía lo fuera a agredir pues lo habían amenazado con una macana. La prueba también demostró que no hubo la alegada coacción pues el apelante fue llevado directamente ante el juez de paz

quien fue el único que le hizo preguntas ante otras personas de la población y varios policías que no se le amenazó, asegurando, por el contrario, que declaraba voluntariamente. No se ha demostrado que el juez de instancia actuase con pasión, prejuicio o parcialidad al hacer las precedentes conclusiones.

La confesión se obtuvo sin prevenir al apelante, antes de iniciar su interrogatorio y cuando ya el apelante había sido aprehendido y privado de su libertad en forma significativa, de su derecho a estar representado por abogado en ese momento. Ni la confesión ni el récord demuestran que el apelante hubiese renunciado a este derecho voluntaria e inteligentemente.

■ Como el juicio en este caso se celebró durante los días 8, 12 y 20 de abril de 1965, no es aplicable en este caso la doctrina de exclusión de confesiones obtenidas cuando el acusado es interrogado sin estar representado por abogado mientras se encuentra detenido en una etapa acusatoria y privado de su libertad en forma significativa, la cual establecimos en *Rivera Escuté* v. *Jefe Penitenciaría*, 92 D.P.R. 765 (1965), ya que en *Pueblo* v. *Adorno Lorenzana*, 93 D.P.R. 788 (1966), dictaminamos que dicha doctrina es aplicable en aquellos casos en que el juicio se celebre a partir de la referida fecha de 26 de octubre de 1965.

*En vista de lo expuesto, se confirmará la sentencia dictada en este caso en 20 de abril de 1965, por el Tribunal Superior, Sala de Guayama.*

El Juez Asociado Señor Santana Becerra concurre en el resultado en voto separado.

—O—

Voto separado del Juez Asociado Señor Santana Becerra

San Juan, Puerto Rico, 27 de enero de 1967

Concurro en el resultado por no estar en condiciones, según el récord, de afirmar categóricamente que la policía no

888

tuviera motivos fundados para creer que la persona a ser arrestada había cometido un delito grave, independiente-mente de que dicho delito se hubiere cometido o no en realidad. Regla 11(c) de las de Procedimiento Criminal.