EL PUEBLO DE PUERTO RICO, demandante y recurrido, *v.* WIL-FREDO ORTIZ ALVARADO, peticionario y recurrente.

*Números:* CE-93-355    *Resueltos:* 1ro de febrero de 1994
CE-93-358

*Modesto López Malavé,* abogado del peticionario; *Carlos Lugo Fiol, Procurador General Interino,* y *Aida Ileana Oquendo Graulau, Procuradora General Auxiliar,* abogados de El Pueblo.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

Los acusados Luis A. Maldonado Torres y Wilfredo Ortiz Alvarado presentaron unas peticiones de *certiorari* en las que solicitan que revisemos la corrección de una resolución y orden dictada por el Tribunal Superior, Sala de Guayama, el 25 de junio de 1993, mediante la cual el tribunal denegó una moción de supresión de evidencia.([1]) El 15 de octubre de 1993, a los fines de evaluar la petición de *certiorari* en el caso *El Pueblo de Puerto Rico v. Wilfredo Ortiz Alvarado*, CE-93-358, ordenamos al Procurador General que sometiera su réplica al recurso.([2]) El 18 de octubre de 1993 el Procurador General compareció, y el 19 de octubre

---

([1]) En dicha Resolución y Orden el tribunal señaló lo siguiente:

"Vistos los argumentos vertidos por escrito tanto de los acusados como del Ministerio Público y escuchada la grabación de la Vista Preliminar del presente caso se declara *No Ha Lugar* la solicitud de Supresión de Evidencia radicada el 26 de mayo de 1993."

([2]) El Juez Asociado Señor Negrón García disintió, haciendo constar lo siguiente:

" 'Reconocemos, que de ordinario, en los casos en que la evidencia es obtenida sin previa orden judicial, el juez debe celebrar una vista evidenciaria, pues dicho registro se presume ilegal y es al ministerio fiscal que le toca aprobar su validez. *Pueblo v. Vázquez Méndez*, 117 D.P.R. 170 (1986).

" 'Sin embargo, se desprende del expediente de autos, que la Moción sobre Supresión, *primero*, fue basada en un análisis del testimonio del agente Maximino Rivera Laporte en la vista preliminar; *segundo*, en la referida moción no se solicitó vista evidenciaria alguna; y *tercero*, el juez la denegó luego de analizar los argumentos y escuchar la grabación de la vista preliminar.

" 'Al respecto, surge que los agentes intervinieron con el acusado peticionario —y otros— a raíz de la información ofrecida por un confidente. La jurisprudencia ha validado este tipo de actuación si: 1) el confidente previamente ha suministrado información correcta; 2) la confidencia conduce hacia el criminal en términos de lugar y tiempo; 3) ha sido corroborada por observaciones del agente, o por información proveniente de otras fuentes; y 4) la corroboración se relaciona con actos delictivos cometidos o en proceso de cometerse. *Pueblo v. Díaz Díaz*, 106 D.P.R. 348 (1977).

" 'Aquí, la información que el confidente ofreció condujo a la policía con exactitud hacia los sospechosos, quienes pudieron ser identificados fácilmente por los agentes. Al intervenir encontraron armas de fuego y dinero en el sitio donde el informante había indicado. Dicho informante era conocido de la policía, quien les había suplido información con anterioridad. En resumen, la información del confidente fue *corroborada*.

" 'En estas peculiares circunstancias, la celebración de una vista para verificar la razonabilidad del registro no hubiese variado la conclusión de que los agentes actuaron con suficientes motivos fundados.' " Resolución de 15 de octubre de 1993, págs. 1-2.

de 1993 emitimos una Resolución mediante la cual conso-
lidamos el caso *El Pueblo de Puerto Rico v. Wilfredo Ortiz
Alvarado*, CE-93-358, con el caso *El Pueblo de Puerto Rico
v. Luis A. Maldonado Torres*, CE-93-355, y concedimos a
las partes un término simultáneo para presentar sus escri-
tos mediante los cuales ampliaran sus planteamientos si
así lo estimaban pertinente. En auxilio de nuestra jurisdic-
ción, paralizamos los procedimientos en instancia.

Las partes han comparecido y, estando en posición de
resolver, así procedemos a hacerlo sin ulteriores
procedimientos.

I

De la declaración jurada suscrita por el agente del Ne-
gociado de Investigaciones Especiales, Maximino Rivera
Laporte, surge la forma en que ocurrió el incidente que
motivó la moción de supresión de evidencia. Éste declaró
que llevaba a cabo una investigación oficial y confidencial
relacionada con el trasiego de drogas y armas de fuego en
Ponce. El martes 23 de febrero de 1993 recibió una lla-
mada telefónica de un informante que, aunque no se iden-
tificó, había venido ofreciendo información por teléfono a
dicho Negociado. Esta información había sido corroborada
y había dado margen a la presentación de cargos contra
varios individuos. El informante le indicó "que unos indi-
viduos iban a salir desde un residendial en Ponce, con ar-
mas de fuego y dinero para hacer una compra de drogas, en
el área de Caguas". *Exhibit* 11, pág. 12. Expresó que viaja-
rían en una *pick-up* Mazda, color vino, con tablilla Núm.
467948, y en un vehículo Ford Tempo negro, con tablilla
Núm. BHC-746. Como consecuencia de esta información,
se estableció una vigilancia, se localizaron los vehículos en
el residencial y se les dio seguimiento. Estos se dirigieron
hacia la autopista Las Américas, desviándose luego por la
salida del pueblo de Coamo. Subsiguientemente, los agen-

tes los perdieron de vista por alrededor de veinte (20) minutos y los volvieron a localizar cuando tomaron nuevamente la autopista en dirección a Salinas. Salieron de dicho pueblo y tomaron la antigua carretera Núm. 1 hasta un sector de parcelas cerca del Albergue Olímpico. El agente y otra unidad se quedaron en la carretera Núm. 1. Luego, los dos (2) vehículos volvieron a salir a la carretera Núm. 1 y tomaron la autopista, saliéndose en el pueblo de Cayey. Allí entraron a una urbanización que queda cerca de la carretera Núm. 14, después de la cual tomaron un camino sin asfaltar donde se observaba, en la entrada, un rótulo que leía Polígono. En la urbanización, el agente se mantuvo dentro de la unidad esperando que salieran. El Polígono estaba cerrado. Como a los veinte (20) minutos, el agente observó que los individuos salieron, dirigiéndose hacia el pueblo de Coamo por la carretera Núm. 14, vía Aibonito, donde los perdieron de vista.

El 25 de febrero de 1993, el agente Rivera Laporte recibió otra llamada del informante. Esta vez indicó que los mismos individuos iban a utilizar una guagua Cherokee, color azul claro, con tablilla Núm. AVD-911, para dirigirse a Cayey, donde probarían unas armas de fuego. Una vez más procedieron a establecer una vigilancia en el residencial en Ponce. El agente observó cuando el vehículo descrito por el informante fue abordado por una persona. De allí lo siguieron hasta el pueblo de Coamo, donde se perdió de vista. Dieron por finalizada la vigilancia.

El 3 de marzo de 1993 el informante llamó nuevamente. Esta vez les dijo que las mismas personas iban a dirigirse a un lugar en Caguas para comprar cocaína y que, de regreso, entrarían a Cayey para probar las armas de fuego. Utilizarían la guagua Cherokee color azul claro, tablilla Núm. AVD-911. También informó que llevarían armas de fuego y bastante dinero en efectivo. Conforme hicieron en las ocasiones anteriores, establecieron vigilanciá en el re-

sidencial público. A eso de las 2:00 P.M., vieron la guagua Cherokee en la cual iba la misma persona que habían visto los días 23 y 25 de febrero de 1993. Este era una persona blanca con barba. En la calle Wilson, cerca del residencial, dos (2) individuos abordaron la guagua Cherokee; un joven que parecía ser menor de edad, trigueño y que vestía pantalón corto negro y *sweater* verde, y otro individuo delgado de pelo claro, con pantalla, y vestido con pantalón deportivo color lila, sudadera negra y muchas prendas. La guagua Cherokee salió en dirección a la autopista Las Américas y se desvió hacia Coamo, donde entró al pueblo y continuó por la carretera vieja hacia Salinas. Luego entró por unas parcelas que salen por la parte trasera del Albergue Olímpico y la autopista, por donde entraron en dirección hacia Cayey. Una vez pasaron el peaje de la autopista, el agente Rivera Laporte impartió instrucciones de intervenir de acuerdo con un plan preacordado. Los bajó de la guagua Cherokee, les informó que era la policía y que, de acuerdo con la información confidencial, ellos transportaban y vendían armas de fuego, drogas y dinero. Debido a que la información recibida indicaba que llevaban armas de fuego y dinero debajo del asiento trasero del vehículo, inmediatamente buscó allí. Encontró en ese lugar tres (3) pistolas, dos (2) de ellas cargadas y una (1) con la serie mutilada, y dinero por la suma de veinte mil diecinueve dólares ($20,019). Puso a los individuos, que resultaron ser los dos (2) acusados peticionarios y un menor, bajo arresto y les hizo las advertencias de ley. El vehículo lo retuvo para fines de confiscación.

Los hechos presentados nos confrontan, una vez más, con la necesidad de determinar la legalidad de un arresto y registro sin orden judicial practicados por agentes del orden público, fundamentados parcialmente en confidencias recibidas por un agente.

## II

En *Pueblo v. Díaz Díaz*, 106 D.P.R. 348, 354 (1977), expresamos "que una confidencia es suficiente para validar la existencia de causa probable si se establece la concurrenciá de una o más de las siguientes circunstancias: 1) que el confidente previamente ha suministrado información correcta; 2) que la confidencia conduce hacia el criminal en términos de lugar y tiempo; 3) que la confidencia ha sido corroborada por observaciones del agente, o por información proveniente de otras fuentes; y 4) que la corroboración se relaciona con actos delictivos cometidos, o en proceso de cometerse". Recientemente, en *Pueblo v. Muñoz, Colón y Ocasio*, 131 D.P.R. 965 (1992), al examinar una situación similar, en la que las declaraciones juradas que dieron apoyo a la expedición de órdenes de arresto y allanamiento estuvieron fundamentadas parcialmente en confidencias hechas a agentes, tuvimos la oportunidad de aclarar el ámbito de los criterios establecidos en *Pueblo v. Díaz Díaz*, supra. Allí expresamos "que aunque en nuestras decisiones hemos dicho que basta uno solo de los requisitos señalados en *Pueblo v. Díaz Díaz*, supra, para que la información provista por un confidente anónimo sirva parcialmente de base para determinar válidamente la existencia de causa probable, *lo cierto es que, al aplicar la norma, siempre hemos exigido que la confidencia haya sido corroborada por el agente, ya sea mediante observación personal o por información de otras fuentes*". (Énfasis en el original.) *Pueblo v. Muñoz, Colón y Ocasio*, supra, págs. 982-983. Reiteramos, además, que en este tipo de caso utilizaríamos esta norma según la hemos interpretado en conformidad con los criterios de la totalidad de las circunstancias esbozados en *Illinois v. Gates*, 462 U.S. 213 (1983).

Con respecto a la corroboración en sí, destacamos que ésta "no debe limitarse a ver si la conducta observada es inocente o incriminatoria, *sino a evaluar el grado de*

*sospecha que conllevan todos los actos de la persona. ... La* investigación policial no tiene que generar por sí misma evidencia suficiente para establecer causa probable. *Es suficiente que indique la presencia de alguna actividad sospechosa del carácter sugerido en la confidencia* que unido a ella y a otras alegaciones en la declaración jurada pueda razonablemente constituir causa probable." (Énfasis suplido.) *Pueblo v. Muñoz, Colón y Ocasio,* supra, págs. 985–986.

■    Debe tenerse presente que la causa probable o el motivo fundado se determina a base de los criterios de probabilidad y razonabilidad. Meras sospechas no bastan; pero tampoco es necesario que el juez quede convencido, fuera de duda razonable, que se está violando la ley ni que se establezca que la ofensa que se imputa fue verdaderamente cometida. Lo importante es si el agente que efectúa el arresto y allanamiento sin orden judicial tiene, al momento de hacerlo, base razonable o motivos fundados para creer que se estaba violando o se iba a violar la ley; esto es, si se desprende, de la totalidad de las circunstancias, que una persona prudente y razonable creería que se ha cometido o se va a cometer la ofensa objeto de las confidencias. Véanse: *Pueblo v. Pagán, Ortiz,* 130 D.P.R. 470 (1992); *Pueblo v. Marrero Rey,* 109 D.P.R. 739 (1980); *Pueblo v. Lastra Sáez,* 93 D.P.R. 876 (1967); *Pueblo v. Tribunal Superior,* 91 D.P.R. 19 (1964).

Analicemos los hechos en el caso de autos a la luz de las normas de derecho anteriormente expuestas.

## III

En el presente caso no existe la menor duda, ni se cuestiona, que el agente del Negociado de Investigaciones Especiales, Rivera Laporte, recibió tres (3) confidencias telefónicas de un informante que, aunque no identificado, había provisto información a la policía anteriormente que

había dado margen a la presentación de cargos contra otros individuos. Tampoco se pone en duda que el agente Rivera Laporte cumplió con su obligación de investigar la información sobre posibles actividades delictivas recibidas mediante las confidencias. *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 144 (1985).

Nos resta, pues, estimar si la evidencia considerada en su totalidad proveía un fundamento sustancial para la determinación de la existencia de causa probable o motivo fundado necesario para validar un arresto y allanamiento sin orden judicial. Es decir, hay que evaluar de la totalidad de los hechos en este caso, si el grado de sospecha que éstos levantan es tal, que una persona prudente y razonable hubiese podido determinar que se había cometido o se iba a cometer el acto delictivo objeto de las confidencias.

En la primera confidencia, el 23 de febrero de 1993, se informó que unos individuos iban a salir de un residencial en Ponce, con armas y dinero para comprar drogas en el área de Caguas. Se identificó los vehículos en que viajarían. No se identificaron o describieron a los individuos. Con relación a esta confidencia, la vigilancia policiaca sólo corroboró que, efectivamente, unas personas salieron en esos vehículos, pasaron por el pueblo de Cayey, tomaron un camino sin asfaltar donde había un letrero que leía "Polígono" y que a los veinte (20) minutos se dirigieron al pueblo de Coamo vía Aibonito, donde se perdieron de vista. Ninguna de estas actividades reveló "alguna actividad sospechosa del carácter sugerido en la confidencia ...". *Pueblo v. Muñoz, Colón y Ocasio*, supra, pág. 986.

Dos (2) días más tarde, se recibió la segunda confidencia, mediante la cual se le informó al agente que los mismos individuos irían a Caguas a probar unas armas de fuego. Nuevamente, sólo describieron el vehículo que sería utilizado. No identificaron ni describieron a los individuos. La vigilancia sólo logró corroborar la confidencia en cuanto

a que una persona, efectivamente, abordó y salió del vehículo en cuestión.

La tercera y última confidencia ocurrió seis (6) días después, el 3 de marzo de 1993. En esta ocasión, el informante indicó que las mismas personas, las cuales tampoco identificó ni describió, irían a Caguas a comprar cocaína y que, de regreso, entrarían a Cayey a probar las armas de fuego. Indicó que llevarían armas de fuego y bastante dinero. Describió el vehículo a ser utilizado. La vigilancia sólo logró corroborar que una de las personas que estuvo presente en las dos (2) ocasiones anteriores, el 23 y 25 de febrero, guiaba el vehículo identificado en la confidencia. A los peticionarios se les detuvo en el peaje en Cayey. Se registró el vehículo y se encontraron tres (3) pistolas y dinero debajo del asiento trasero, donde había indicado el informante.

Como podrá observarse, surge con meridiana claridad que la investigación policial no reflejó actividad sospechosa alguna del carácter sugerido en la confidencia referente al trasiego de drogas y armas de fuego. El que una misma persona, en tres (3) ocasiones distintas, aborde o guíe unos vehículos previamente identificados por un confidente no constituye, sin más, una actividad sospechosa del carácter sugerido por la confidencia. Tampoco lo sería si a esto se le uniese el hecho de que en una ocasión, mientras los vigilaban, uno de los acusados fue en el vehículo hasta el Polígono en Cayey, que resultó estar cerrado. Tampoco valida un registro y arresto el hecho de que efectivamente se haya encontrado el material delictivo que indicó el informante. Es la *conducta previa* al registro la que debemos evaluar para determinar si efectivamente había causa probable o motivo fundado para llevarlo a cabo.

Al tomar en consideración la totalidad de las circunstancias, o sea, el hecho de que el informante había ofrecido información confiable previamente; la corroboración sobre

la utilización de los vehículos descritos en la confidencia; el que uno de los peticionarios estuvo presente en las tres (3) ocasiones, y el que en la primera ocasión pasaran por el Polígono de Cayey, estimamos que no levanta un grado de sospecha suficiente para que una persona prudente y razonable crea que los acusados estaban portando drogas y armas de fuego para la venta.

En todos los casos donde hemos determinado, al amparo de los criterios establecidos en *Pueblo v. Díaz Díaz*, supra, que una confidencia ha sido suficiente para sostener la validez del arresto y allanamiento, los hechos reflejan que ha habido una corroboración de alguna actividad sospechosa del carácter sugerido en la confidencia. Veamos.

En *Pueblo v. Díaz Díaz*, supra, la vigilancia logró corroborar que los acusados fueron vistos frente al Banco, en el vehículo identificado en la confidencia, sin sombrero, boina y gafas, y que luego, cuando estaban siguiendo al mensajero, los tenían puestos; que se adelantaron al vehículo del mensajero que tenía la nómina, pararon bruscamente en el centro de la carretera en un puente y salieron del vehículo. La confidencia era sobre el robo de una nómina al mensajero del Banco.

En *Pueblo v. Pagán, Ortiz*, supra, se recibieron varias confidencias relacionadas con el trasiego de drogas en una residencia. La vigilancia corroboró una conducta altamente sospechosa, tanto de parte de personas en la residencia, como de personas que llegaban en vehículos a ella.

En los tres (3) casos consolidados en *Pueblo v. Muñoz, Colón y Ocasio*, supra, las confidencias versaban sobre el juego ilegal conocido popularmente como "bolita" y sobre la venta de drogas. En todos se corroboró ampliamente las actividades sospechosas relacionadas con la conducta delictiva objeto de las confidencias.

Por todo lo antes expuesto, *determinamos que procedía la supresión de la evidencia. Por consiguiente, se dictará sentencia revocando la resolución del foro de instancia, de-*

*negando la moción de supresión de evidencia y, de confor-*
*midad con esa sentencia, se concederá la moción de supre-*
*sión de evidencia solicitada por los acusados peticionarios.*

El Juez Asociado Señor Negrón García disintió me-
diante una opinión escrita.

**– O –**

Opinión disidente del Juez Asociado Señor Negrón García.

La opinión del tribunal descarta injustificadamente va-
rios presupuestos en que se apuntala el juzgar. *Primero,*
como Jueces insertos en la sociedad, debemos reconocer la
realidad y dinámica criminosa que genera el triste y escla-
vizante, pero lucrativo, tráfico ilegal de sustancias contro-
ladas (drogas). *Segundo,* hoy "arropa a nuestra isla el fe-
nómeno explosivo de una dinámica criminosa que ha
convertido el automóvil hurtado o robado en el instru-
mento codiciado y favorito de la delincuencia, *por la movi-*
*lidad, facilidad y rapidez en que puede desplazarse y huir*
*por las modernas vías urbanas*". (Énfasis suplido y escolios
omitidos.) *Caquías v. Asoc. Res. Mansiones Río Piedras,*
134 D.P.R. 181, 221–222 (1993), opinión disidente. *Tercero,*
" '[e]s de conocimiento común que el vehículo ilegalmente
apropiado es utilizado por los delincuentes para llevar a
cabo fechorías tales como robos, asaltos, escalamientos y
asesinatos como un medio para impedir su identificación
por la policía.' Exposición de Motivos de la Ley Núm. 8 de 5
de agosto de 1987, Leyes de Puerto Rico, pág. 655. Diversos
estudios tienden a confirmar la interacción sustancial que
existe entre el incremento de esos delitos y el consumo y
tráfico    del    alcohol,    sustancias    controladas    o
estupefacientes". (Énfasis suprimido.) Íd., pág. 223.
*Cuarto,* "el concepto de motivos fundados —como sinónimo
de causa probable, *Pueblo v. Díaz Díaz,* 106 D.P.R. 348, 353
(1977)— no es un férreo producto de un examen o experi-

mento a posteriori en el laboratorio aséptico judicial. Tampoco corresponde al mundo de lo académico. No es teórico ni abstracto, sino esencialmente pragmático. Lo que se le exige al policía son motivos fundados, a saber, razones suficientes o eficaces. Ello excluye certeza matemática y menos evidencia de culpabilidad". *Pueblo v. Malavé González,* 120 D.P.R. 470, 490 (1988). *Quinto,* "el adjetivo *razonable* viene del latín *'rationabilis'* que significa 'arreglado, justo, conforme a razón; 2. ant. racional'. *Diccionario de la Lengua Española, op. cit.,* T. II, pág. 1147. Como tal, es obrar con discernimiento. Versa sobre realidades eminentemente pragmáticas, de carácter relativo y flexible. No es estático. En diferentes épocas y momentos conlleva variados significados y grados. Se puede dar sobre situaciones inesperadas, más o menos imperiosas y urgentes, en que la libertad y curso de acción para actuar de diversos modos se reduce notablemente. Lo razonable descansa en lo moderado, en la cautela, prudencia, en la acción u omisión. Por ende, la variabilidad en el comportamiento del ser humano involucrado en todo acto criminoso y los distintos trasfondos del acto (sitio, hora, personas, edades y naturaleza y gravedad) son factores pertinentes para evaluar la razonabilidad de un registro y allanamiento hecho sin orden judicial". *Pueblo v. Malavé González,* supra, pág. 491. *Sexto,* hemos de evaluar la conducta de la Policía a base de la información y experiencia que posean. Es absurdo pretender que los agentes del orden público actúen con miopía ocular o intelectual, ingenuamente o sin imaginación. *Séptimo,* la función de dirimir los hechos corresponde a los jueces de instancia; salvo circunstancias de error manifiesto o arbitrariedad, no debemos intervenir. Y *octavo,* evitemos eregir barreras procesales innecesarias que tiendan a demorar más la pronta solución de los casos criminales.

# I

De ordinario, cuando la evidencia es obtenida sin una orden judicial previa y está en juego la credibilidad, el juez debe celebrar una vista evidenciaria; el registro se presume ilegal y corresponde al Ministerio Fiscal probar su validez. *Pueblo v. Vázquez Méndez*, 117 D.P.R. 170 (1986).

Esa no es la situación de autos. La *Moción sobre Supresión* de los peticionarios Wilfredo Ortiz Alvarado y Luis A. Maldonado Torres fue fundamentada *exclusivamente* en una argumentación escrita del testimonio del agente Maximino Rivera Laporte presentado en la vista preliminar. En esa moción Ortiz Alvarado *no solicitó vista evidenciaria alguna*. Ello explica por qué el Tribunal Superior, Sala de Guayama (Hon. Ramón Orta Berríos, Juez), no la señaló ni celebró. El ilustrado tribunal, luego de analizar los argumentos y *escuchar* la grabación de la vista preliminar, en cuanto al coacusado Maldonado Torres, la denegó. *¿Cómo puede revocar la mayoría del Tribunal, sin escucharla también?*

Independientemente de esta grave anomalía adjudicativa, aun circunscribiendo nuestra revisión apelativa a las declaraciones juradas y argumentos de los peticionarios Ortiz Alvarado y Maldonado Torres, resulta claro que la intervención policial fue legal y válida. Nos explicamos.

# II

En la vista preliminar el agente Rivera Laporte atestó que el 23 de febrero de 1993 recibió una llamada en su teléfono celular de una persona que rehusó identificarse, informándole que unas personas saldrían del Residencial Ponce de León de Ponce, *con dinero y armas para realizar un negocio de drogas en Caguas*. Le describió los vehículos en que viajarían como una guagua *Pick Up* marca Mazda,

color vino, tablilla 467948 y un auto Ford, modelo "Tempo", color negro, tablilla BHC-746.

Oportunamente, Rivera Laporte divisó esos vehículos en dicho residencial y, en unión a otros agentes, los siguió por la autopista Las Américas hasta la salida hacia el municipio de Coamo. Allí los perdieron de vista por unos veinte (20) minutos y los localizaron otra vez cuando tomaban la autopista en dirección a Salinas. Los vehículos se desviaron hacia unas parcelas cercanas al Albergue Olímpico y luego retornaron a la autopista hasta llegar a Cayey. Los siguieron por un camino sin asfaltar donde había un letrero que leía "Polígono". Veinte (20) minutos más tarde salieron y se dirigieron nuevamente hacia Coamo. El Polígono estaba cerrado ese día, y no pudieron verlos utilizando las armas para poder arrestarlos. Se dirigieron entonces a Coamo por la Carretera Núm. 14 y, a la altura del pueblo de Aibonito, los perdieron de vista.

Dos (2) días después, el 25 de febrero, Rivera Laporte volvió a recibir otra llamada de la misma persona comunicándole que las mismas personas irían esta vez a Cayey a probar unas armas en una guagua *Cherokee*, color azul claro, tablilla AVD-911. Se dirigió al Residencial Ponce de León, localizó el vehículo y lo siguió por la autopista Las Américas hasta la salida de Salinas, donde lo perdió de vista.

Varios días después, 3 de marzo, recibió una tercera llamada del informante anónimo quien le indicó que las personas buscarían a alguien en Ponce, irían a Caguas a comprar un kilo de cocaína y, de regreso, entrarían a Cayey a probar unas armas. Le indicó, además, que saldrían después del mediodía en la guagua *Cherokee* azul clara y llevarían armas de fuego y "bastante" dinero en el asiento trasero. Nuevamente, Rivera Laporte fue al residencial Ponce de León donde prestó vigilancia desde la 1:30 P.M. Aproximadamente a las 2:00 P.M., vio la guagua *Cherokee* y reconoció a su conductor como una de las personas obser-

vadas en las dos (2) vigilancias anteriores. Notó también cerca, en la Calle Wilson, un grupo de jóvenes reunidos y dos (2) que abordaron el vehículo. Uno era menor de edad.

Rivera Laporte había coordinado un plan de acción para *intervenir* con los individuos, en unión a otros agentes, una vez concluyera su vigilancia. Se comunicó por radioteléfono que lo harían en el peaje de Juana Díaz, lugar que ofrecía suficiente protección para la Policía. Allí, no pudieron detener la *Cherokee*, pues prosiguieron la marcha desviándose hacia Coamo y siguieron por la carretera vieja hacia Salinas, donde entraron a las parcelas próximas al Albergue Olímpico.

Rivera Laporte se comunicó entonces con los agentes de la Patrulla de Autopistas para que los detuvieran en el "peaje de 65 centavos" e intervinieran con el vehículo. Lo hicieron. Cuando Rivera Laporte llegó a la estación de peaje, puso a los sospechosos bajo arresto, les informó sobre la confidencia recibida y procedió a registrar el vehículo. *Encontró debajo del asiento trasero las armas y el dinero informados en la confidencia.*

## III

Es obvio que los agentes intervinieron a raíz de la información ofrecida por un confidente. Nuestra jurisprudencia ha validado este tipo de actuación si (1) el confidente previamente ha suministrado información correcta; (2) la confidencia conduce hacia el criminal en términos de lugar y tiempo; (3) ha sido corroborada por observaciones del agente o por información proveniente de otras fuentes, y (4) la corroboración se relaciona con actos delictivos cometidos o en proceso de cometerse. *Pueblo v. Pagán, Ortiz*, 130 D.P.R. 470 (1992); *Pueblo v. Muñoz, Colón y Ocasio*, 131 D.P.R. 965 (1992); *Pueblo v. Díaz Díaz*, 106 D.P.R. 348 (1977).

La información que el confidente ofreció en tres (3) oca-

siones distintas condujo a la Policía con exactitud hacia los sospechosos, quienes pudieron ser identificados fácilmente por los agentes. En la tercera ocasión, al intervenirlos encontraron armas de fuego y dinero en el sitio exacto donde el informante les había indicado. Dicho informante era conocido de la Policía, pues les había suplido información con anterioridad; *su información siempre fue corroborada.*

Ante estas circunstancias procesales y fácticas, la celebración de una vista para verificar la razonabilidad del registro era innecesaria. En recta lógica adjudicativa, no hubiese variado la conclusión de que los agentes actuaron con suficientes motivos fundados.

Ante esta realidad, es increíble la conclusión mayoritaria de que "la investigación policial no reflejó actividad sospechosa alguna del carácter sugerido en la confidencia referente al trasiego de drogas y armas de fuego". Opinión mayoritaria, pág. 49.

El error de la mayoría estriba en analizar separadamente las actividades observadas y corroboradas por la Policía. Aunque predican "la totalidad de las circunstancias", aplican un enfoque fraccionado, de compartimientos. Como resultado, toda la experiencia e información confiable que fue acumulando el agente Rivera Laporte para configurar los motivos fundados, se esfumó. Tal parece que la mayoría pierde de vista que las confidencias eran sobre el trasiego de drogas y armas de fuego. ¿Cómo ignorar la ruta e ida hacia el Polígono de Cayey? ¿Cómo descartar la última confidencia que los puso en dirección hacia Caguas, lugar predestinado para comprar cocaína?

Decisiones como la presente explican por qué la Policía no puede prevenir el crimen y está perdiendo la batalla.