En el Tribunal Supremo de Puerto Rico

| El Pueblo de Puerto Rico<br>       Recurrido<br><br>              V.<br><br>Rafael Camilo Meléndez<br>Clay Hernández Camilo y<br>Johnny Alemán Colón<br>       Peticionarios | Certiorari<br><br>99 TSPR 94 |
| --- | --- |

Número del Caso: CC-1997-0100

Abogado de los Peticionarios: Lcdo. Luis E. Cabán Dávila

Abogados de la Parte Recurrida:     Hon. Carlos Lugo Fiol,
                                    Procurador General
                                    Lcda. Grisel Hernández Esteves,
                                    Procuradora General Auxiliar

Tribunal de Instancia, Sala Superior de Carolina

Juez del Tribunal de Primera Instancia: Hon. José A. Rodríguez Arenas

Tribunal de Circuito de Apelaciones: Circuito Regional VII

Panel Integrado por:     Hon. Arbona Lago
                         Hon. Negroni Cintrón
                         Hon. Salas Soler

Fecha: 6/16/1999

Materia: Art. 401

       Este documento constituye un documento oficial del Tribunal
       Supremo que está sujeto a los cambios y correciones del
       proceso de compilación y publicación oficial de las
       decisiones del Tribunal. Su distribución electrónica se hace
       como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

       v.                      CC-97-100         Certiorari

Rafael Camilo Meléndez;
Clay Hernández Camilo;
y Johnny Alemán Colón

    Peticionarios

Opinión del Tribunal emitida por el Juez Presidente, señor Andréu García

San Juan, Puerto Rico a 16 de junio de 1999

Al expedir el recurso de certiorari presentado en el caso de epígrafe nos corresponde establecer si procede la supresión de evidencia obtenida como resultado de un registro con orden judicial, llevado a cabo en una estructura de ocupación múltiple, en la que no se especificó las sub-unidades a ser registradas. Debemos, además, pasar juicio en cuanto a la validez de un registro efectuado a un "vagón residencia" estacionado en los predios donde está ubicada la mentada estructura. Veamos los hechos que dan lugar al presente caso.

I.

En la madrugada del día 14 de junio de 1996, cerca de las 3:00 a.m., la Policía de Puerto

Rico, con la correspondiente orden judicial, registró y allanó varios apartamientos sitos en una estructura de ocupación múltiple, de más de una planta, con el número 837, en la carretera 845 del sector Antigua Vía, en Trujillo Alto.

Según surge de los resúmenes testificales de las partes, la Policía allanó, en primer lugar, el apartamiento D-4, en el que se encontraban durmiendo la Sra. Iris Jaelis Crespo Carrasquillo junto a su esposo e hijos. La Policía no encontró allí ningún material delictivo. Luego la Policía procedió a registrar el apartamiento E-5, en el que se encontraba la Sra. Carmen Melecio, su esposo, su hija y su nieto. Allí los agentes tampoco encontraron material delictivo. Procedieron, entonces, a registrar y allanar el apartamiento A-1, donde reside el coacusado Rafael Camilo Meléndez junto a su madre, y donde se encontraba de visita su sobrino, el coacusado Clay Hernández Camilo. En ese apartamiento encontraron sustancias controladas.

Luego de realizar los registros y allanamientos en los tres apartamientos antes descritos, la policía se dirigió hacia el estacionamiento en donde se encontraba estacionado un "vagón residencia" o "remolque". En ese lugar, según surge de las alegaciones, residía temporeramente el señor Johnny Alemán Colón debido a que su apartamiento estaba siendo remodelado. El "remolque" fue registrado. Allí se ocupó un arma de fuego calibre 9mm cargada.

**Todos los registros antes descritos fueron realizados por virtud de <u>la misma orden de registro</u>**.

Como resultado de los registros se presentaron acusaciones contra Rafael Camilo Meléndez y Clay Hernández Camilo, por infracción al Artículo 401 de la Ley de Sustancias Controladas[1]. Se presentó, además, acusación contra Johnny Alemán Colón por violaciones a los Artículos 6 y 8 de la Ley de Armas[2].[3]

---

[1] Ley Núm. 4 de 23 de junio de 1971, 24 L.P.R.A. Sec. 2401 (Sup. 1998).

[2] Ley Núm. 17 de 19 de enero de 1951, 25 L.P.R.A. §§ 416 y 418 (1979 y Sup. 1998).

Oportunamente, la defensa radicó una Moción Solicitando Supresión de Evidencia y Vista Evidenciaria a nombre de cada acusado individualmente.[4] Fundamentó su pedido en que la Policía había utilizado de forma general la misma orden de registro para todos los apartamientos, sin especificar a cuál o cuáles de ellos se dirigía. Alegaron, además, que el testimonio del agente José Salgado Félix, que dio base a la expedición de la orden de registro, fue estereotipado, por lo que ésta era inválida. Luego de celebrada la vista de supresión de evidencia y de desfilar la prueba el Magistrado declaró no ha lugar la moción de supresión.

No conformes con esa determinación la representación legal de los acusados presentó un recurso de revisión ante el Tribunal de Circuito de Apelaciones. Mediante resolución fechada el 24 de enero de 1997, el tribunal apelativo denegó expedir el recurso de certiorari. Los acusados solicitaron reconsideración y ésta fue denegada. Así las cosas, éstos recurren ante este foro mediante una Petición de Certiorari. Luego de expedido el auto y con el beneficio de la comparecencia de ambas partes, estamos en posición de resolver.

Los acusados presentan ante nosotros los siguientes planteamientos de error:

1. Erró el Honorable Tribunal de Circuito de Apelaciones al confirmar una Resolución oral del Tribunal de Primera Instancia, Sala de Carolina denegando la supresión de la evidencia encontrada en el apartamento del acusado Rafael Camilo Meléndez, ya que la orden que dio base a dicho allanamiento era nula e ilegal porque no describía específicamente los apartamentos a registrar a pesar de que una observación desde el exterior de la propiedad demostraba que la estructura consistía de varios apartamentos.

2. Erró el Honorable Tribunal de Circuito de Apelaciones al confirmar una Resolución oral del Tribunal de Primera Instancia, Sala de Carolina denegando la supresión de la

---

[3] Luego de diligenciado el allanamiento el agente José Rivera González prestó una declaración jurada en la que hacía inventario del material delictivo ocupado. Según la declaración jurada se ocuparon "(415) bolsitas con picadura de marihuana, (246) bolsitas con cocaína, (1) cadena de oro de 24''; (1) valentino inicial JC, (5) sortijas, balas, (4) rifles, (1) metralleta, (5) pistolas, $2,020.00 y dos peines plásticos cargados." <u>Véase</u>, Apéndice de Petición de Certiorari, Anejo VI, en la pág. 26.

[4] Posteriormente todas las mociones de supresión radicadas por los acusados individualmente fueron consolidadas.

evidencia encontrada en el automóvil tipo "camper" [sic] ubicado al lado de la estructura allanada, ya que el registro de esa unidad fue ilegal e irrazonable sin orden válida máxime cuando ese "camper" [sic] era utilizado como vivienda del acusado Johnny Alemán Colón, quien tenía una expectativa de privacidad en el mismo mayor que en la de un vehículo de motor común.

3. Erró el Honorable Tribunal de Circuito de Apelaciones al confirmar una Resolución oral del Tribunal de Primera Instancia, Sala de Carolina denegando la supresión de la evidencia consistente en el testimonio estereotipado del Agente José Salgado Félix.

II.

El Artículo II, Sección 10, de la Constitución del Estado Libre Asociado de Puerto Rico consagra la protección del individuo y sus pertenencias contra registros y allanamientos irrazonables. Esta disposición constitucional, en la parte que nos concierne, lee de la siguiente manera:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
> [....]
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, <u>describiendo particularmente el lugar a registrarse</u>, y las personas a detenerse o las cosas a ocuparse.
>
> La evidencia obtenida en violación de esta sección será inadmisible en los tribunales. (énfasis nuestro)

En ocasión de haber interpretado esta disposición constitucional, en Pueblo v. <u>Miranda Alvarado</u>, Op. de 2 de junio de 1997, 143 D.P.R. ___ (1997), 97 J.T.S. 84, en la pág. 1114, expresamos lo siguiente:

> Esta garantía constitucional persigue tres objetivos históricos: proteger la intimidad y dignidad de los seres humanos, amparar sus documentos y otras pertenencias e interponer la figura de un juez entre los funcionarios públicos y la ciudadanía para ofrecer mayor garantía de razonabilidad a la intrusión [del Estado]. <u>E.L.A.</u> v. <u>Coca Cola Bott. Co.</u>, 115 D.P.R. 197, 207 (1984). La protección constitucional [ampara] aquella propiedad sobre la cual la persona tenga una expectativa de privacidad. <u>Pueblo</u> v. <u>Pérez Narváez</u>, [130 D.P.R. 618 (1992)]; <u>Pueblo</u> v. <u>Lebrón</u>, 108 D.P.R. 324, 331 (1979). El ámbito de la prohibición protege a todos, tanto al sospechoso o conocido ofensor como al inocente, y se extiende al lugar objeto del registro. <u>Pueblo</u> v. <u>Acevedo Escobar</u>, 112 D.P.R. 770, 775-76 (1982).

"En términos prácticos, . . . [esta] disposición constitucional pretende impedir que el Estado interfiera con la intimidad y libertad de las personas excepto en aquellas circunstancias en las que el propio ordenamiento lo permite."[5] Pueblo v. Yip Berríos, Op. de 30 de enero de 1997, 142 D.P.R. ___ (1997), 97 J.T.S. 14, en la pág. 567.

El precepto constitucional antes citado tiene como objetivo básico proteger la intimidad y dignidad de los seres humanos. En virtud de ello, todo registro realizado por el Estado, sin la debida orden judicial, equivale a una intromisión en el espacio de la privacidad del individuo. Para evaluar si la intervención policial viola la expectativa razonable de intimidad deben considerarse los siguientes factores: 1) el lugar registrado o allanado; 2) la naturaleza y grado de intrusión en la intervención; 3) el propósito u objetivo de la intervención; 4) si la conducta de la persona era indicativa de una expectativa subjetiva de intimidad; 5) la existencia de barreras físicas que restrinjan la entrada o visibilidad del lugar registrado; 6) la cantidad de personas que tienen acceso legítimo al lugar registrado; 7) y las inhibiciones sociales relacionadas con el lugar registrado. Pueblo v. Rivera Colón, 128 D.P.R. 672, 684 (1991).

Al enfrentarnos a controversias como la que presenta el caso de epígrafe, en las que se invoca la protección constitucional contra registros y allanamientos irrazonables, somos conscientes que nos

_____

[5] Algunas de esas circunstancias excepcionales son, por ejemplo, los casos en que se trata de un registro de la persona y del área circundante, siempre que sea incidental a un arresto legal, Véanse, Pueblo v. Malavé, 120 D.P.R. 470 (1988); Pueblo v. González Rivera, 100 D.P.R. 651 (1972); Pueblo v. Sosa Díaz, 90 D.P.R. 622 (1964); cuando existe consentimiento para el registro o se ha renunciado al derecho constitucional contra registros y allanamientos irrazonables, Véase, Pueblo v. González, supra; cuando el registro ocurre en una situación de emergencia, Véase, Pueblo v. Rivera Collazo, 122 D.P.R. 408 (1988); cuando se trata de evidencia que se encuentra a plena vista, Véase, Pueblo v. Dolce, 105 D.P.R. 422 (1976); cuando la evidencia es descubierta por medio del olfato del agente, Véase, Pueblo v. Acevedo Escobar, 112 D.P.R. 770 (1982); o cuando la evidencia ha sido incautada luego de haber sido arrojada o abandonada, Véase, Pueblo v. Ortiz Zayas, 122 D.P.R. 567 (1988); Pueblo v. Ortiz Martínez, 116 D.P.R. 139 (1985). En estos casos el de expectativa de intimidad que proteger es menor o inexistente, ya sea por que se ha renunciado a la protección o por que frente al interés postulado por el Estado se ha resuelto que es mínima, por lo tanto, no se configura una violación a la sección 10 del Artículo II de la Constitución de Puerto Rico.

enfrentamos a la ancestral pugna entre los derechos constitucionales que amparan a los ciudanos y el interés del Estado de combatir la criminalidad. A esos efectos, anteriormente, hemos expresado:

> En este género de casos, como en tantos otros, hay colisión de intereses y nuestra tarea es luchar por hallar los modos de propiciar la armonía entre ellos. De un lado tenemos el interés histórico en proteger al ciudadano de los desmanes que provocaron en primer término el establecimiento de la garantía. Del otro, se halla el interés en proteger a la sociedad de los estragos del crimen. Consideramos que el método más deseable de lograr el equilibrio necesario no consiste en la formulación de reglas mecánicas, excesivamente abarcadoras. Debemos distinguir entre categorías de situaciones, adentrarnos en la atmósfera total de cada caso para hallar el significado preciso, dentro de unas circunstancias específicas, de un concepto tan elusivo y volátil como es el de la razonabilidad.
> Véanse, Pueblo v. Dolce, 105 D.P.R. 422, 434-35 (1976); Pueblo v. Malavé González, 120 D.P.R. 470, 473-74.

En esta pugna entre el Estado y el individuo, la autoridad judicial juega un rol conciliador que define e interpreta el alcance de las protecciones y garantías constitucionales.

En virtud de lo anterior y de los requerimientos constitucionales, hemos reconocido como principio cardinal que la necesidad de una orden judicial previa, obedece a la política pública de rango prioritario que exige la protección de la integridad, dignidad e intimidad del ser humano, interponiendo la figura del juez, como garantía de razonabilidad, a la intervención del Estado. Pueblo v. Dolce, supra.

Nuestro ordenamiento, por medio de las Reglas de Procedimiento Criminal, establece las circunstancias específicas en que un juez habrá de expedir una orden de registro o allanamiento.

La Regla 230 de Procedimiento Criminal, 34 L.P.R.A. Ap. II R.230 (1998), define cuales son los objetos que pueden ser sujetos a incautación mediante la orden judicial. A esos efectos dispone que "[p]odrá librarse orden de allanamiento o registro para buscar y ocupar propiedad:

> (a) hurtada, robada, estafada u obtenida mediante extorsión,

> (b) que ha sido, está siendo o se propone ser utilizada como medio para cometer un delito."

Se requiere que una persona preste una declaración jurada, ante un Magistrado, en la que detalle los hechos que justifican la expedición de la orden. Antes de librar la orden, el Magistrado debe quedar convencido que de la declaración jurada y del examen del declarante surge causa probable para que se lleve a cabo el registro o el allanamiento. Una vez expedida, <u>ésta debe describir con particularidad o nombrar a la persona o lugar que será registrado y los objetos a ocuparse</u>. Se exige, además, que la orden exprese los fundamentos que la sustentan y los nombres de las personas en cuyas declaraciones juradas se basa. Regla 231 de Procedimiento Criminal, 34 L.P.R.A. Ap. II R.231 (1998).

La Regla 234 de Procedimiento Criminal, 34 L.P.R.A. Ap. II R.234 (1998), es el medio procesal que permite que, aún en aquellos casos en los que se ha expedido orden judicial para realizar un registro o allanamiento, la persona agraviada por éste pueda solicitar al tribunal la supresión de cualquier evidencia obtenida. Esta Regla permite la supresión de evidencia en casos en los que:

1. la orden de allanamiento o registro fuere insuficiente de su propia faz;

2. la propiedad ocupada o la persona o sitio registrado no corresponde a la descripción hecha en la orden de allanamiento o registro.

3. no había causa probable para creer en la existencia de los fundamentos en que se basó la orden de allanamiento o registro.

4. la orden de allanamiento fue librada o cumplimentada ilegalmente;

5. la declaración jurada que sirvió de base para la expedición de la orden fue insuficiente por la falsedad, total o parcial, de lo afirmado bajo juramento.

Establecidos los preceptos legales que regulan las controversias que plantea el caso de epígrafe, nos corresponde examinar los planteamientos de derecho que presenta la parte recurrente. Debido a que el tercer planteamiento de error plantea la invalidez de la declaración jurada que dio base a la orden judicial para realizar el

registro, discutiremos este planteamiento prioritariamente. Si determináramos que la orden fue ilegalmente expedida, tendríamos que concluir que la presencia de los agentes en la estructura, en ausencia de las circunstancias excepcionales, era ilegal y, por tanto, el registro irrazonable. Esa determinación haría innecesario entrar a considerar los restantes señalamientos de error, ya que procedería la supresión de toda la evidencia obtenida como resultado de la presencia ilegal de los agentes en el lugar. Posteriormente consideraremos el primer planteamiento de error, que impugna la validez de la orden judicial por falta de especificidad del lugar a ser registrado. Finalmente, procederemos a examinar el segundo planteamiento de error, que impugna la validez del registro realizado al "vagón residencia".

III.

### A. Suficiencia del Testimonio que da Base a la Expedición de la Orden de Registro o Allanamiento

Alega la parte recurrente que el testimonio del agente que dio base a la expedición de la orden de registro fue estereotipado. Basa su contención en que el agente describe en su declaración dos hechos delictivos que observó en una sola ocasión. Señala que la causa probable requerida para que se expida una orden de registro debe sustentarse "sobre [una] actividad criminal continua, así como [en] afirmaciones específicas sobre las distintas fechas en que observó la comisión del delito objeto de la actividad criminal continua."[6] Sostiene que, debido a que el agente se limita a describir una sola acción criminal, no hubo una conducta criminal continua que justificara la expedición de la orden de registro. Concluye, por tanto, que ello inválida la orden de registro y, en consecuencia, debe suprimirse la evidencia obtenida, producto del registro. No le asiste la razón.

---

[6] Petición de Certiorari, en la pág. 15.

En *Pueblo* v. *Tribunal Superior*, 91 D.P.R. 19 (1964), expresamos, basados en la jurisprudencia de los tribunales federales[7], que para establecer la causa probable requerida para la expedición de una orden de registro o allanamiento, no es necesario establecer que de hecho la ofensa que se imputa fue cometida. Basta que el deponente haya tenido base razonable para entender que se había violado la ley en el lugar a ser registrado o allanado. Esto es suficiente para la expedición de la orden.

Debe tenerse presente que causa probable o motivo fundado se determina a base de criterios de probabilidad y razonabilidad. El criterio de razonabilidad se basa en el de un individuo prudente y razonable que, en el análisis de los hechos aparentes, puede creer que se ha cometido la ofensa imputada. Este criterio no debe basarse en meras sospechas, pero tampoco requiere que el juez quede convencido, fuera de duda razonable, que se está violando la ley, ni que se establezca que la ofensa que se imputa fue verdaderamente cometida. *Pueblo* v. *Pagán Santiago*, 130 D.P.R. 470, 483-84 (1992); *Véanse*, además, *Pueblo* v. *Muñoz Santiago*, 131 D.P.R. 965, 979-80 (1992); *Pueblo* v. *Marrero Rey*, 109 D.P.R. 739 (1980); *Pueblo* v. *Lastra Sáez*, 93 D.P.R. 876 (1967); *Pueblo* v. *Tribunal Superior*, *supra*.

El criterio de probabilidad no debe basarse exclusivamente en criterios subjetivos, debido a que es uno esencialmente objetivo. Una vez establecidos los hechos y circunstancias que justifiquen concluir la existencia de causa probable, éstos deberán exponerse en la declaración jurada.

La razonabilidad del registro está sujeta a la determinación de que los hechos observados configuran la causa probable necesaria para la expedición de la orden. En el caso de los registros o allanamientos, la causa probable consiste en la probabilidad de que exista determinado

---

[7] Allí citamos los casos *Rugendorf* v. *U.S.*, 376 U.S. 528 (1964); *Jones* v. *U.S.*, 362 U.S. 257 (1960) y *Aguilar* v. *Texas*, 378 U.S. 108 (1964).

objeto incautable y que ese objeto se encuentra en el lugar a ser registrado o allanado.[8]

No se puede confundir el grado de prueba requerido para establecer causa probable para expedir una orden de arresto, con el que se exige para expedir la orden de registro o allanamiento. En los casos en que se solicita al magistrado que expida una orden de arresto, el grado prueba para establecer la causa probable es aquel que sea suficiente para creer que la persona ha cometido un delito. La orden está dirigida para proteger al individuo de una intervención irrazonable del Estado sobre su persona. Se exige prueba suficiente que establezca los elementos del delito y la conexión entre el imputado y el delito.[9]

Por otra parte, para que un magistrado expida una orden de registro o allanamiento la causa probable debe basarse en la creencia razonable que el objeto incautable del registro se encuentra en el lugar particular a ser allanado.[10]

En la declaración jurada, que dio base a la orden de registro impugnada por los recurrentes, el agente expresó que en el mes de mayo había recibido una confidencia anónima la cual le indicaba que en la carretera 845 de la Antigua Vía en Trujillo Alto se encuentran dos residencias. Una de las residencias es descrita de una planta, color rosa, con número 838, la otra de tres niveles, incluyendo el sótano color crema, con el número 837. En éstas, según la confidencia, se dedicaban a la venta y procesamiento de sustancias controladas y al trasiego de armas de fuego. Luego de varias visitas al lugar para investigar, según hizo constar en la declaración jurada, el 9 de junio de 1996, el agente Salgado Félix observó lo siguiente:

> . . . un joven de apróx[imadamente] 19 años, tez oscura, corte pegado al cráneo [sic], 5'10'' apróx[imadamente], 140 a 150 lbs

---

[8] 1 ERNESTO L. CHIESA, DERECHO PROCESAL PENAL DE PUERTO RICO Y ESTADOS UNIDOS § 6.10, en la pág. 358 (1991).

[9] Véanse, 1 OLGA ELENA RESUMIL, PRÁCTICA JURÍDICA DE PUERTO RICO: DERECHO PROCESAL PENAL § 11.5, en la pág. 280 (1990); 1 CHIESA, supra, § 6.10, en las págs. 356-58 (1991).

[10] Véase, 1 RESUMIL, supra, en la pág. 280.

apróx[imadamente], y vistiendo camisa blanca, gorra negra, pantalón mahón negro y tennis [sic] blancas con una bolsa mediana transparente conteniendo en su interior envases cilindricos [sic] pequeños con tapa azul conteniendo en su interior polvo blanco a lo que por mi experiencia supe se trataba de sustancias controladas (cocaína) . . . .

[....]

. . . veo cuando éste le da la bolsa plástica a una señora de apróx[imadamente] 55 a 60 años, trigueña oscuro, 5'6'' apróx[imadamente], pelo corto negro, vistiendo una bata de flores azul, por una reja que tiene la entrada de la puerta de la residencia de un nivel que me indicaban en la querella . . . .

[....]

. . . sigo caminando y hago un gesto como si algo se me había quedado en el vehículo y cuando viro hacia atrás veo al individuo antes descrito que saca de una guagua Dodge con tab[lilla] 555-641, una escopeta recortada y un rifle metiéndolos en una bolsa plástica de basura y camina hacia la residencia de tres (3) niveles [#837], y escucho a el [sic] joven antes descrito llamar a un individuo por el nombre de Toño en varias ocasiones frente a la residencia de tres (3) niveles, y sale un individuo de apróx[imadamente] 5'6'', recorte bajito, trigueño claro, bigote, pelo negro ondulado, y sale por la puerta del balcón en el segundo nivel, luego oigo cuando c/p Toño dice: "Papón que me traistes [sic]" y el c/p Papón le contesta, "Vine a traerte la ropa que me pediste" y el c/p Toño le contesta "Ok, gracias bajo ahora", luego el c/p Toño entra a la residencia y sale por la parte de abajo de la residencia donde el c/p Papón le entrega la bolsa que contenía las armas . . . .
Véase, Apéndice de Petición de Certiorari, Anejo VI, en la pág. 22-23.

En virtud del testimonio anteriormente descrito, los recurrentes sostienen que la orden judicial expedida por el Magistrado esta basada en un testimonio estereotipado prestado por el agente Salgado Félix.

Este Tribunal siempre ha reconocido la dedicada tarea que desempeñan los agentes encubiertos en su empresa contra el crimen. En el descargo de su difícil labor, obran arriesgando sus vidas y ello merece nuestro reconocimiento y respeto. Sin embargo, también, este Tribunal se ha enfrentado a situaciones en las que se ha demostrado que no es remota la posibilidad de que en su afán de erradicar el mal social que entraña el crimen, algunos agentes del orden público actúen de manera que violen derechos que reconoce nuestro ordenamiento a las personas.

En virtud de ello, es doctrina establecida en Puerto Rico que el uso de declaraciones estereotipadas por cualquier tipo de testigo, en este caso agentes del orden público, debe ser objeto de escrutinio riguroso

para evitar que declaraciones falsas o inexactas, vulneren derechos de ciudadanos inocentes. Pueblo v. González del Valle, 102 D.P.R. 374, 376 (1974).

Nuestra jurisprudencia ha definido el concepto de testimonio estereotipado como "aquel que se reduce a establecer los elementos mínimos necesarios para sostener un delito sin incluir detalles imprescindibles para reforzarlos." Pueblo v. Rivera Rodríguez, 123 D.P.R. 443, 480 (1989).

En Pueblo v. González del Valle, supra, mencionamos los criterios para evaluar la credibilidad de un testimonio estereotipado:

1. Debe ser escudriñado con especial rigor.

2. Tanto los casos de "la evidencia abandonada" o "lanzada al suelo" como los casos del "acto ilegal a plena vista" deben, en ausencia de otras consideraciones, inducir sospecha de la posible existencia de testimonio estereotipado.

3. Cuando el testimonio es inherentemente irreal o improbable debe rechazarse.

4. El testimonio estereotipado puede perder su condición de tal si, yendo más allá de los datos indispensables para probar los requisitos mínimos de un delito, se le rodea de las circunstancias en que funciona el agente, el término de su investigación, los resultados obtenidos fuera del caso en trámites y otros detalles.

5. La presencia de contradicciones o vaguedades en el testimonio debe tender a reforzar el recelo con que hay que escuchar esta clase de declaraciones.

Al examinar la declaración jurada que dio base a la expedición de la orden de registro notamos que el testimonio del agente no fue estereotipado. El agente Salgado Félix, narró hechos específicos, que le constaron de propio conocimiento, en los que describe haber observado unas armas de alto calibre, siendo éstas objetos incautables, según lo dispuesto por la Regla 230 de las de Procedimiento Criminal.

Luego observó que éstas se introdujeran a la estructura con el número 837, siendo éste el lugar en el que se habían cometido los actos delictivos y en el que se encontraban los objetos incautables. La descripción del agente incluye detalles descriptivos de la investigación realizada y los hechos observados. Aquí el agente declaró la forma y manera en que realizó la investigación, los lugares específicos de dónde realizó las observaciones y un relato descriptivo detallado de las personas y lugares investigados. Atestó, además, sobre la existencia de los objetos delictivos que se introdujeron a la residencia. Los detalles totales de la declaración jurada, unidos a la localización de la estructura, y los hechos del caso, impiden que el testimonio del agente pueda ser calificado de estereotipado.

Siendo válido el testimonio del agente, no cabe duda, entonces, que, ante lo expresado en la declaración jurada, se configura la causa probable requerida para expedir la orden de registro.

Por todo lo anterior, resolvemos que el testimonio prestado por el agente Salgado Félix no fue estereotipado. Su testimonio fue suficiente para establecer la "causa probable" necesaria para expedir la orden de registro o allanamiento.

### B. Legalidad del Registro a la Estructura de Vivienda Múltiple #837

La parte recurrente alega que la orden de registro que expidiera el Magistrado es inválida ya que la estructura objeto del registro era de ocupación múltiple. Tal estructura, según expone, requería que el agente especificara claramente en su declaración jurada el lugar a registrarse. Concluye que no fue así. Alega que como resultado de esa imprecisión fueron registrados varios apartamentos con la misma orden judicial. Solicitan los recurrentes que en ausencia de las exigencias constitucionales, legales y jurisprudenciales, declaremos ilegales los registros efectuados y, en consecuencia, que la evidencia obtenida cómo resultado de éstos sea suprimida.

Nos corresponde discutir, entonces, si la descripción del lugar a ser registrado fue suficiente para satisfacer el requerimiento constitucional.

La Constitución del Estado Libre Asociado, en la sección 10 del Artículo II, dispone, como imperativo para la razonabilidad del registro o allanamiento que se hace en virtud de una orden, que ésta describa con particularidad el lugar a ser registrado. En virtud de ello, y como mencionáramos anteriormente, la Regla 231 exige que en una orden de allanamiento debe describirse "con particularidad la persona y el lugar a ser registrado y las cosas o propiedad a ocuparse."

Lo que se pretende evitar con esto es que agentes del orden público actúen de manera caprichosa o arbitraria al momento de diligenciar una orden de registro. Pueblo v. Bonilla, 78 D.P.R. 152, 156 (1955). Por tanto, el elemento esencial es que no se delegue a estos funcionarios la discreción de registrar lugares que no estén contemplados en la orden.[11]

La ausencia de una descripción específica de la estructura objeto del registro es un defecto que, de ordinario, la invalida y lleva ineludiblemente a la supresión de la evidencia obtenida. En Pueblo v. Pérez Narváez, 130 D.P.R. 618 (1992), nos expresamos favorablemente sobre el tratamiento que las cortes federales le han dado a casos en los que agentes del orden público han practicado allanamientos con orden en lo que se conoce como "estructuras de ocupación múltiple". Allí intimamos que "[e]n tales situaciones, la doctrina es clara al establecer que una orden de allanamiento será insuficiente —de su faz— si sólo describe de forma general la totalidad de la estructura de ocupación múltiple sin hacer referencia específica a la unidad a la cual pretenden ganar acceso los agentes del orden público." Id. en la pág. 631.

---

[11] 1 Chiesa, supra, en las págs. 351-53.

De lo contrario, con una mera descripción general de la estructura a ser registrada o allanada, los agentes tendrían libre albedrío para accesar todas las sub-unidades residenciales de la estructura. Esto daría al traste con el imperativo constitucional de que la orden debe sostenerse por la creencia razonable de que en determinado lugar se está violando la ley. Ello es así ya que en esos casos cada apartamiento es una unidad residencial que exige, para llevar a cabo un registro por orden judicial, que un juez pase juicio sobre una declaración jurada que contenga hechos específicos que sostengan la existencia de causa probable que establezca que en esa unidad se realiza alguna actividad delictiva. De lo contrario, el registro sería irrazonable y, por tanto, la evidencia obtenida no puede ser admisible en los tribunales.

La excepción a esta norma general, que ha sido reconocida por las cortes federales[12] y que hemos adoptado, consiste en aquellos casos en los que la estructura en cuestión, por su apariencia exterior, parezca ser una estructura de "ocupación singular" o de una sola unidad residencial.

> Conforme la mencionada excepción, si 1) los agentes del orden público no conocían que la estructura era de ocupación múltiple; 2) no hubieran podido descubrirlo mediante una investigación razonable antes del allanamiento y 3) llevaron a cabo tal hallazgo en el momento de diligenciarse la orden, la misma será completamente válida y suficiente en Derecho.
> Véase, Pueblo v. Pérez Narváez, supra, en la pág. 632 (énfasis nuestro). Véase, 2 WAYNE R. LA FAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 4.5(b), en la pág. 529 (3rd ed. 1996).

Del pasaje antes transcrito podemos apreciar que no basta desconocer que la estructura es de ocupación múltiple. Es necesario, además, que, previo a llegar a esa conclusión, el agente haya realizado una investigación razonable mediante la cual no se hubiere podido descubrir que la estructura es de ocupación múltiple. Lo anterior debe examinarse a la luz de la siguiente interrogante: Dada la forma externa de la

---

[12] Véase, United States v. Santore, 290 F.2d 51 (2nd Cir. 1959). Véanse, además, United States v. Carrillo-Morales, 27 F.3d 1054 (5th Cir. 1994); United States v. Noel, 938 F.2d 685 (6th Cir. 1991); United States v. Williams, 917 F.2d 1088 (8th Cir. 1990); United States v. Hinds, 856 F.2d 438 (1st Cir. 1988).

estructura, ¿sería razonablemente probable que la estructura sea erróneamente registrada?. A mayor grado de probabilidad de registrar erróneamente esa estructura, con más rigurosidad debe examinarse la razonabilidad de la investigación realizada por los agentes.

Surge, pues, de nuestros pronunciamientos que, en aquellos casos en los que la particular configuración física de una estructura sugiere razonablemente que la misma es de ocupación múltiple, los agentes investigadores tienen la obligación de realizar una investigación razonable para determinar si en efecto una estructura, que será objeto de un registro con orden, es de ocupación múltiple. Id.; Véase LaFave, supra, § 4.5(b), en la pág. 530-31.[13] Si a la luz de la particular configuración física de la estructura, de haberse realizado una investigación pudo haberse razonablemente inferido que la misma es de ocupación múltiple, una persona perjudicada por un registro realizado al amparo de una orden judicial que no particularizara las unidades residenciales, debe prevalecer en una solicitud de supresión de evidencia obtenida como resultado de ese registro.

La ausencia de este requerimiento podría promover la inactividad de algunos agentes del orden público que, basados en observaciones o investigaciones insustanciales, obtendrían órdenes de registro generalizadas que les permitiría ejercer su discreción para registrar sub-unidades residenciales dentro de una estructura de ocupación múltiple.

La excepción que adoptáramos en Pueblo v. Pérez Narváez, supra, según desarrollada en la jurisdicción federal, ha sido aplicada en aquellos casos en los que los agentes del orden público no han podido, mediante una investigación razonable, identificar la estructura como de ocupación múltiple. A esos efectos en United States v. Esters, 336 F.Supp. 214, 221 (1972), el tribunal expresó:

---

[13] La justificación a la excepción se halla en el hecho de que los agentes del orden público no pueden ser culpables del defecto en la descripción de una estructura cuando, luego de una investigación razonable, no había forma de descubrir que la estructura es una de ocupación múltiple. LaFave, supra, § 4.5(b), en la pág. 530.

The test to be applied in this situation, however, is not whether the officers had actual knowledge, but the test is whether they should have known that the building was not a one-family home. (énfasis nuestro).
Véase, además, United States v. Parmenter, 531 F.Supp. 975, 980-81 (1982).

De la misma manera, pero en la jurisdicción estatal, en State v. Patmon, 604 P.2d 82, 85 (1979), la Corte Suprema de Kansas se expresó de la siguiente manera sobre la aplicación de la excepción:

Basically, the exceptions have been recognized when it was unreasonably difficult for the police to ascertain the multi-unit character of the building before the execution of the warrant. (énfasis nuestro)

Debido a la invalidez de la orden, en State v. Patmon, supra, el Tribunal Supremo estatal resolvió que procedía la supresión de la evidencia obtenida. Según concluyó el Tribunal, "[t]here was no showing by the police of any investigation into the multi-unit character of the building." Id. en la pág. 85.

No existe, sin embargo, una fórmula matemática o científica para establecer cuándo la investigación que realizan los agentes del orden público, previo a prestar la declaración jurada en la que se describe el lugar a ser registrado, es razonable. Somos del criterio que en estos casos debe imperar la norma de que la razonabilidad de la investigación se determinará a la luz de la circunstancias y los hechos particulares del caso. En ese sentido, sin la intención de ser exhaustivos, se debe considerar si mediante una investigación razonable los agentes podían identificar la naturaleza de la estructura por los signos externos de ésta, por experiencias previas de compañeros agentes que hayan realizado registros en el lugar[14], preguntar a personas que residen en el área, entre otras técnicas investigativas que reflejen un esfuerzo razonable de los agentes de localizar e identificar propiamente el lugar objeto del registro.

No pretendemos con esta opinión que los agentes realicen una investigación tan intensa que arriesgue la secretividad que, de

---

[14] Véase, U.S. v. Noel, 938 F2d 685, 687 (6th Cir. 1991).

ordinario, requiere este tipo de investigación. Un requerimiento tan estricto pondría en peligro no sólo a la investigación, sino, además, a los agentes del orden público. Lo que si entendemos necesario es delimitar las prácticas investigativas del Estado de manera que se garantice la protección constitucional de las personas a no ser intervenidas en su propiedad de forma irrazonable. Es por ello, que para sostener la validez de un registro de varias sub-unidades dentro de una estructura de ocupación múltiple, por virtud de una orden que no especifica las unidades a ser registradas por desconocimiento del agente que prestó la declaración jurada, ante una impugnación de ese proceder, el Estado debe demostrar que, luego de una investigación razonable realizada por los agentes, no era posible determinar que la estructura era de ocupación múltiple.

Veamos los hechos del caso de epígrafe a la luz de lo anteriormente expuesto.

La orden expedida describía el lugar a ser registrado de la siguiente manera:

> Estructura de hormigón  de tres (3) plantas color crema y rosita claro, rejas negras y gris con el núm. 837, carr. 845 del Sector Antigua Vía, Trujillo Alto, Puerto Rico. Lado derecho; residencia de dos plantas parte alta en madera color verde y la parte baja sin pintar. Lado izquierdo; residencia de una planta en hormigón con el núm. 838 en el buzón, puerta en madera y la estructura color rosa. Frente; carr. 845 del Sector Antigua Vía en Trujillo Alto. Atrás; rancho techado en zinc y solar yermo.
> <u>Véase</u>, Apéndice de Petición de Certiorari, Anejo I, en la pág. 2.

El Procurador General alega, contrario al razonamiento de los recurrentes, que de la declaración jurada presentada por el agente Salgado Félix surge que éste desconocía que la estructura era de ocupación múltiple. Sostienen que el agente había realizado observaciones desde afuera de la estructura y que desde allí no había ningún indicio de que se tratara de una residencia dedicada al alquiler de apartamentos. No podía especificar la unidad a ser registrada, ya que desconocía que la estructura estuviese dividida en apartamentos.

No obstante la contención del Procurador, **de los autos no surge que el agente haya realizado una investigación razonable para determinar si**

**en efecto la estructura multipisos era destinada para residencia de ocupación múltiple**.

Por el contrario, al examinar las fotocopias de fotos anejadas al expediente que acompaña la Petición de Certiorari, notamos que la estructura es una multipisos que se encuentra dentro de un solar con verja de cemento y reja uniforme, con un solo portón de entrada vehicular y peatonal. Se pueden observar, además, dos contadores de electricidad y la numeración de los apartamientos en las paredes y puertas de éstos que muestran una división residencial en la estructura.[15] Todos estos, a nuestro juicio, son signos externos mediante los cuales una persona razonablemente puede concluir que la estructura es de ocupación múltiple.

Lo anterior debe considerarse a la luz del testimonio del Alguacil José R. Betancourt Pomales, de la Unidad de Arrestos y Citaciones del Tribunal de Carolina. En su testimonio el agente Betancourt Pomales expresó que:

> [ha realizado] varias citaciones en la carretera 845, específicamente [en] el edificio 837, en [el] que hay distintos apartamentos. Este fue a los diferentes apartamentos a diligenciar, dice que hay de 5 a 6 apartamentos en la estructura, **que no tuvo problemas en distinguir que la estructura es de distintos apartamentos**. Dice también que ha realizado citaciones en el edificio como 3 ó 4 ocasiones, y que se ha tardado entre cinco o diez minutos.
> Véanse, Petición de Certiorari, en la pág. 5. Véase, además, Alegato del Procurador General, en la pág. 2 (énfasis suplido).

Por otra parte, de la declaración jurada del agente Salgado Félix, que dio base para la expedición de la orden, surge que, como parte de la investigación, realizó observaciones desde un negocio cercano a la residencia.[16] No nos parece, que a la luz de los hechos de este caso, sea irrazonable que, como parte de su investigación, el agente hubiese preguntado a alguna persona del lugar sobre la naturaleza residencial de la estructura.

---

[15] Véase, Petición de Certiorari, Apéndice, Anejo II, Exhibits I-H, I-F y I-G, en las págs. 8-10.

[16] Véase, Petición de Certiorari, Apéndice, Anejo VI(c), en las págs. 51-52.

Un análisis de la prueba nos muestra, también, que las observaciones del agente Salgado Félix estaban dirigidas a la actividad criminal que se llevaba a cabo en el área, pero no a la naturaleza del lugar en el que entendía se estaba llevando a cabo la actividad. El agente se limitó a observar el exterior de la residencia sin más investigación al respecto.

A la luz de todo lo anterior, concluimos que no era irrazonablemente difícil para el agente determinar que la estructura era de ocupación múltiple. Por lo que resolvemos que la orden judicial expedida para el registro de la estructura numerada 837 de la carretera 845 era insuficiente por no describir con con adecuada especificidad el lugar a ser registrado.

Por otro lado, asumiendo que el agente realizó una investigación razonable del lugar y que de ésta no pudo inferir razonablemente que la estructura era de residencias múltiples, dada la naturaleza fáctica de este caso tendríamos también que concluir que el registro que produjo la incautación de la evidencia fue irrazonable.

Nuestra posición se sustenta en que los hechos del caso ante nuestra consideración demuestran que una vez los oficiales del orden público comenzaron el diligenciamiento de la orden y conocieron la naturaleza estructural del lugar —múltiples residencias— debieron descontinuar el registro. Por tanto, todo registro efectuado por los agentes luego de haber obtenido tal conocimiento, fue ilegal.

Ello puede parecer contrario a lo que expresáramos en Pueblo v. Pérez Narváez, supra, sin embargo, no es así. En aquella ocasión nos enfrentamos a una impugnación de la suficiencia de una orden judicial que limitaba el registro a una funeraria. La situación particular en aquella ocasión fue que la estructura resultó ser utilizada para dos fines distintos. El primer piso estaba destinado para uso comercial (la funeraria) y el segundo piso resultó ser la residencia del peticionario. En el segundo piso se encontró material delictivo.

Ante nos se apeló la convicción del peticionario fundamentándose en la alegada insuficiencia en la descripción del lugar a ser allanado. Al confirmar la convicción intimamos que, debido a los hechos particulares del caso, aunque se trataba de una estructura destinada a dos fines distintos, la protección constitucional que cobija la privacidad del hogar de un individuo se vio menos afectada, debido a que no se trataba de una estructura de múltiples residencias, sino de un solo ocupante de un edificio destinado a dos usos distintos. Pueblo v. Pérez Narváez, supra, en las págs. 632-33.

Claramente, la situación fáctica que presenta el caso de epígrafe se distingue de la que enfrentáramos entonces.[17] En el caso de epígrafe se trata de una estructura destinada para múltiples residencias a las que, como tales, este Tribunal le ha reconocido el más alto grado de protección contra registros y allanamientos irrazonables. Es por ello que no es irrazonable, a la luz de las circunstancias fácticas del caso ante nuestra consideración, exigir que, al momento de diligenciar la orden y percatarse de que la estructura era de múltiples residencias, los agentes descontinuran el registro hasta obtener una orden conforme a las exigencias constitucionales.

Al respecto, el Tribunal Supremo de los Estados Unidos, en Maryland v. Garrison, 480 U.S. 79, 87 (1986), expresó lo siguiente:

> Moreover, as the officers recognized, they were required to discontinue the search of the respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put to notice of the risk that they might be in a unit erroneously included within the terms of the warrant. (énfasis suplido).

A la luz de todo lo anterior, concluimos que el registro realizado al apartamiento A-1 de la estructura de residencias múltiples violentó

---

[17] El comentarista de Derecho Procesal Penal, Ernesto Chiesa Aponte, al comentar nuestra opinión en Pueblo v. Pérez Narváez, supra, reconoció la mencionada distinción de la siguiente forma: "El Tribunal Supremo de Puerto Rico observó, con buen juicio, que había mejores razones para validar la orden, pues no se trataba de múltiples residentes o familias, sino de un solo ocupante que destinaba su propiedad para dos fines distintos: funeraria y residencia." Ernesto L. Chiesa Aponte, Procedimiento Criminal, 62 Rev. Jur. U.P.R. 869, 902 (1993) (énfasis nuestro).

la protección contra registros y allanamientos e incautaciones irrazonables que provee nuestra Carta de Derechos. Por todo lo cual, procede la supresión de la evidencia obtenida como producto del mencionado registro.

Pasamos, entonces, a examinar la legalidad del registro efectuado en el "vagón residencia".

## C. Legalidad del Registro del "Remolque" o "Vagón Residencia"

Sobre el señalamiento de error en cuanto a la validez del registro y allanamiento del "vagón residencia" los recurrentes sostienen que, debido a la inexistencia de una orden de registro válida y conforme a derecho, los agentes se hallaban de forma ilegal en la propiedad registrada. Por ello, solicitan que la evidencia ocupada, fruto del registro sin orden judicial válida, sea suprimida.

Como es sabido, en nuestra jurisdicción toda evidencia que sea obtenida como fruto de una intervención constitucionalmente viciada debe ser suprimida. Ello surge no sólo cómo requerimiento procesal, sino, además, como mandato constitucional.[18] "La aplicación de la regla de exclusión se extiende también a evidencia obtenida como resultado de la explotación de una intervención inconstitucional bajo las disposiciones que protegen el derecho del pueblo a la protección contra arrestos, registros y allanamientos irrazonables."[19]

Al examinar los autos del caso de epígrafe notamos que, ni en la declaración jurada del agente, que dio base a la expedición de la orden judicial, ni en la orden de registro expedida por el Magistrado, se hace referencia al "vagón residencia". Por el contrario, todo parece indicar que esta unidad nunca fue objeto de la investigación realizada por el agente para determinar si en ella se estaban realizando actos delictivos. Surge claramente, de la orden expedida por el Magistrado, que los agentes sólo estaban autorizados para realizar un registro en

---

[18] Véase, CONST. DE P.R. art. II, § 10. Véase, además, Reglas 230–234 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II R.230–234 (1998).

[19] 1 RESUMIL, supra, en la pág. 306 (1990).

la "[e]structura de hormigón de tres (3) plantas color crema y rosita claro, rejas negras y gris con el núm. 837, carr. 845 del Sector Antigua Vía, Trujillo Alto . . ."

Ante la inexistencia de orden judicial válida, es forzoso concluir que los agentes no tenían la facultad en ley para registrar el "vagón residencia".

No obstante lo anterior, el Procurador General sostiene en su alegato que, aún ante la inexistencia o invalidez de la orden judicial, el registro del "vagón residencia" cumple con las exigencias constitucionales que impone nuestro ordenamiento, por lo que no procede la supresión de la evidencia ocupada. Para sustentar su contención, el Procurador General señala que en nuestra jurisdicción hemos reconocido que la expectativa de intimidad de una persona y el alcance de su protección contra registros y allanamientos irrazonables es menor cuando se trata del registro de un automóvil.

El Procurador, además, alude a aquella jurisprudencia federal en la que se ha delimitado el ámbito de protección que reciben los "vagones residencias". Particularmente, cita el caso de <u>California</u> v. <u>Carney</u>, 471 U.S. 386 (1984). En ese caso la Corte Suprema de los EE.UU. revocó una determinación de la Corte Suprema de California, que resolvía que el registro de un "vagón residencia" fue irrazonable debido a que no se había expedido una orden de registro y que la excepción de vehículos de motor, al requerimiento de orden judicial previa, no aplicaba debido a que el "vagón residencia" era utilizado con propósitos residenciales más que como automóvil. La Corte Suprema federal sustentó su determinación en que, para establecer la razonabilidad del registro en un "vagón residencia", es necesario distinguir el uso que se le está dando a la unidad. La Corte concluyó que cuando un vehículo es utilizado en las carreteras o se le puede dar ese uso y es encontrado estacionado en un área que no es utilizada, de ordinario, con propósito residencial, se activa la excepción de automóviles. En esos casos el vehículo posee más atributos de automóvil que de residencia. A esos

efectos, el Procurador concluye que los recurrentes, en el caso de epígrafe, no han colocado al Tribunal en posición adecuada para resolver si el "vagón residencia" era utilizado con propósitos residenciales o de automóvil.

Debemos determinar, entonces, si, como afirma el Procurador, por la naturaleza vehicular del "vagón residencia", se sostiene la validez del registro realizado sin orden judicial, y, por tanto, de la admisibilidad de la evidencia allí encontrada.

Somos del criterio que, a base de las premisas expuestas por el Procurador, no es necesario considerar su razonamiento en virtud de las determinaciones hechas por los tribunales federales. La irrazonabilidad de la intervención de los agentes al registrar el "vagón residencia", sin orden judicial previa, es sostenible tanto si consideramos esta unidad con las características propias de una residencia o, si en la alternativa, la consideramos con las de un automóvil.

Examinemos, primeramente, la validez del registro del "vagón residencia" al amparo de la protección constitucional contra registros y allanamientos irrazonables realizadas en estructuras residenciales. Es decir, esto sería al palio de la protección más abarcadora que ofrece la sección 10 del Artículo II de la Constitución de Puerto Rico.

Según hemos establecido, en nuestro ordenamiento constitucional, todo registro y allanamiento realizado sin una orden judicial previa se presume irrazonable y, por lo tanto, inválido. E.L.A. v. Coca Cola Bottling Co., 115 D.P.R. 197, 207 (1984). La presunción de invalidez beneficia al acusado y obliga al Ministerio Público a presentar evidencia para demostrar la legalidad y razonabilidad de la actuación del Estado[20]. En estos casos, el Ministerio Público debe rebatir la

---

[20] Esto es contrario a los casos que existe una orden previa que produce una presunción de validez de la actuación gubernamental. Esta presunción de validez obliga a la parte promovente de la moción de supresión a presentar evidencia para rebatir la legalidad o razonabilidad de la actuación gubernamental. Véanse, Pueblo v. Vázquez Méndez, supra, en la pág. 177; Regla 15(A) de Evidencia, 32 L.P.R.A. Ap. IV, R.15(A) (1983).

presunción de invalidez demostrando la existencia de alguna de las circunstancias excepcionales que justifican actuar sin orden judicial previa. Véase, Pueblo v. Vázquez Méndez, supra, en la pág. 177 (aplicando las Reglas 14 y 15(B) de Evidencia, 32 L.P.R.A. Ap. IV, R.13, 14 y 15(B) (1983)).

En su alegato el Procurador expresa lo siguiente:

En el caso ante nos resulta primordial señalar que el fiscal Julio Vargas, quien atendió la vista de supresión de evidencia, nos informó que no recuerda prueba alguna sobre el registro del vehículo "camper" [sic]. Curiosamente el resumen de testimonios que hacen los peticionarios carece completamente de referencias a la prueba relacionada con el vehículo "camper". Nadie mencionó el "camper" [sic], ni las circunstancias del supuesto registro. Tampoco surge nada relativo al "camper" [sic] en las declaraciones juradas de los agentes Salgado y Rivera, ni en el inventario del diligenciamiento. Debemos concluir que no desfiló prueba sobre el alegado registro al vehículo.
Véase, Alegato del Procurador General, en la pág. 12.

Asimismo de los autos no surge ninguna prueba o evidencia que demostrara la razonabilidad de la intervención de los agentes al registrar el "vagón residencia".

En virtud de lo anterior y siendo al Estado a quién correspondía establecer la razonabilidad y validez de su intervención, ante la ausencia de orden judicial previa, es forzoso concluir que se sostiene la presunción de irrazonabilidad y procede la supresión de la evidencia obtenida como producto del registro en el "vagón residencia".

Por otra parte, al examinar el registro del "vagón residencia" al amparo de la protección constitucional contra registros y allanamientos de automóviles, como pretende el Procurador sostener en su alegato, debemos hacerlo bajo la protección atenuada que este Tribunal le ha reconocido, al amparo de la Sección 10 del Artículo II de la Constitución de Puerto Rico, a las personas que transitan en éstos vehículos.

Es norma establecida por este Tribunal que el registro de un vehículo se presume irrazonable cuando es realizado sin una orden judicial previa. Pueblo v. Sosa Díaz, 90 D.P.R. 622 (1964). No obstante la norma general, hemos reconocido que, por su naturaleza, los

vehículos gozan de una protección constitucional atenuada. Pueblo v. Malavé, 120 D.P.R. 470, 478 (1988). A esos efectos en Pueblo v. Yip Berríos, supra, en la pág. 568, expresamos:

> Esto no significa que al viajar en un automóvil renunciamos a nuestro derecho a la intimidad y no autoincriminarnos. Lo que ocurre es que por las diferencias conceptuales y funcionales existentes entre un vehículo y una residencia, así como por el hecho de que el tránsito por las vías públicas es una materia muy reglamentada, hemos reconocido como razonable un grado de intrusión gubernamental mayor con el ámbito de intimidad individual en tales circunstancias que la que de ordinario se reconoce en una residencia. **No obstante, en uno u otro caso la validez de la intervención gubernamental queda condicionada a que dentro de las circunstancias del caso tal intervención sea razonable.** (citas omitidas) (énfasis suplido).

Si bien hemos reconocido que existe una distinción entre lo que es un registro razonable en el caso de un automóvil y el caso de una residencia o local fijo, tal distinción no ha eliminado el requerimiento de causa probable para realizar el registro. Pueblo v. De Jesús Robles 92 D.P.R. 345, 359 (1965). A esos efectos, en Pueblo v. Malavé González, supra, en la pág. 480, expresamos:

> Conscientes del potencial de uso ilícito de este medio de transportación [en referencia a los automóviles], desde mediados de la década de los años sesenta autorizamos el registro sin orden de un vehículo dependiendo de "los hechos y circunstancias –la atmósfera total– del caso". **En nuestro ordenamiento constitucional la razonabilidad del registro de un automóvil sin orden judicial ha dependido de que haya causa probable para el mismo y de que existan unas circunstancias especiales que provean la justificación necesaria.** (cita omitida) (énfasis nuestro).

Al referirnos a los autos del caso de epígrafe no se desprende de éstos que el Estado haya mostrado prueba para establecer que en el lugar registrado, el "vagón residencia", se hubiese llevado a cabo el tipo de actividad que razonablemente llevaría a una persona prudente a creer que allí se había cometido un delito. Como dijéramos anteriormente, ante la ausencia de causa probable correspondía al Estado demostrar la razonabilidad de su intervención. Para ello, según hemos intimado, debió presentar prueba que estableciera la existencia de motivos fundados o causa probable para intervenir con el vehículo (entiéndase el "vagón residencia") que se encontraba aparcado en el estacionamiento. En ausencia de prueba que estableciera la causa

probable o las circunstancias especiales que originaran la intervención de los agentes, al registrar el "vagón residencia", debemos concluir que la mencionada intervención fue irrazonable. Por lo tanto, resolvemos que la evidencia obtenida como resultado de esa intervención no es admisible en el Tribunal.

Por todo lo anterior, aún considerando la contención del Procurador General, no cabe duda que en el caso de epígrafe la intervención del Estado, al registrar el "vagón residencia", que se encontraba aparcado en el estacionamiento de la estructura, sin orden judicial previa, fue irrazonable. Procede, por tanto, suprimir la evidencia obtenida como resultado de esa intervención.

IV.

Por lo antes dispuesto, procede dictar Sentencia revocatoria. Se devuelve el caso al Tribunal de Primera Instancia, Sala Superior de Carolina, para la continuación de los trámites ulteriores pertinentes de conformidad con lo resuelto en la Opinión del Tribunal.

Se dictará sentencia de conformidad.


José A. Andréu García
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

       v.                          CC-97-100         Certiorari

Rafael Camilo Meléndez;
Clay Hernández Camilo;
y Johnny Alemán Colón

    Peticionarios

SENTENCIA

San Juan, Puerto Rico a 16 de junio de 1999

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, y habiéndose expedido el recurso de certiorari el 12 de marzo de 1997, se dicta sentencia revocando la resolución dictada por el Tribunal de Circuito de Apelaciones, Circuito Regional VII de Carolina y Fajardo, el 24 de enero de 1997, en el caso Número KLCE97-000334, Pueblo v. Rafael Camilo Meléndez, Clay Hernández Camilo, y Johnny Alemán Colón. Se devuelve el caso al Tribunal de Primera Instancia, Sala Superior de Carolina, para la continuación de los trámites ulteriores pertinentes de conformidad con lo resuelto en la Opinión del Tribunal.

Lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri, concurre solo en el resultado sin opinión escrita. El Juez Asociado señor Negrón García, disiente con opinión escrita.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Demandante-recurrido

                                    CC-97-100     Certiorari

       v.

Rafael Camilo Meléndez; Clay
Hernández Camilo y Johnny
Alemán Colón

    Demandados-peticionarios

    Opinión Disidente del Juez Asociado señor Negrón García

San Juan, Puerto Rico, a 16 de junio de 1999

"Es un principio universal que el hecho humano siempre precede al Derecho. De ahí, para el jurisprudente, la importancia de evaluar **cuidadosamente todas las circunstancias fácticas**; lo contrario significa desdibujar el trasfondo empírico que determina la aplicación correcta de la norma jurídica y, con ello, arriesgarnos a perpetuar una injusticia." <u>Pueblo en interés menor F.S.C.</u>, 128 D.P.R. 931, 945 (1991), Opinión Disidente Juez Asociado, Señor Negrón García.

**Deferencialmente objetamos nuevamente una práctica adjudicativa a ciegas, que desvirtúa fatalmente el recto proceso apelativo.** Al igual que

en <u>Pueblo</u> v. <u>Colón Bernier</u>,[21] res. en 20 de abril de 1999, la mayoría decide tomar como veraz y correcta la versión presentada por los acusados en su petición, **sin una Exposición Narrativa de la Prueba.** Ignora así por completo los hechos destilados por el Tribunal de Instancia, que tuvo la oportunidad directa de aquilatar y dirimir la credibilidad de los testigos, no sólo por sus testimonios, sino por la apreciación de las expresiones no verbales  -gestos, miradas, etc.-, no reproducidos en un alegato. De ese modo, la mayoría olvida el principio elemental decisorio de que **los hechos determinan el derecho, no a la inversa.** <u>Sociedad Legal de Gananciales</u> v. <u>García Robles</u>, res. en 23 de enero de 1997, Opinión Disidente, Juez Asociado, Sr. Negrón García.

I

El Ministerio Público acusó a Rafael Camilo Meléndez y a Clay Hernández Camilo de violar el Art. 401 de la Ley de Sustancias Controladas y, a Johnny Alemán Colón, de infringir los Arts. 6 y 8 de la Ley de Armas. Estas acusaciones fueron producto de un registro y allanamiento autorizado por orden judicial, diligenciado en la estructura de Núm. 837 en la Carr. 845, Sector Antigua Vía, Trujillo Alto, y en un **remolque** estacionado en el patio. Desde la carretera, la apariencia exterior de la estructura era de una sola unidad residencial; sin embargo, resultó estar compuesta de más de un (1) apartamento en que residían diferentes familias.

---

[21] En <u>Pueblo</u> v. <u>Colón Bernier</u>, luego de la vista preliminar, el acusado presentó una moción de supresión de evidencia, la cual fue declarada "sin lugar de plano", por lo que no se celebró vista evidenciaria. El acusado presentó <u>certiorari</u> ante el Tribunal de Circuito de Apelaciones, que, sin entrar en detalles sobre los hechos del caso, denegó la expedición del auto. Este Tribunal, **sin una Exposición Narrativa de la Prueba, revocó y concedió la moción de supresión.**

En aquella ocasión disentimos por entender que la creencia fundada de que el acusado poseía una bicicleta hurtada, unido a la dudosa procedencia y precio irrisorio según manifestado por éste al policía, generaron suficientes motivos fundados para su arresto. También objetamos que se utilizaran los hechos tal y como fueron presentados por el acusado.

Los acusados solicitaron la supresión a base de que la orden de registro y allanamiento violaba el Art. II, Sec. 10 de nuestra Constitución por alegadamente estar basada en un testimonio estereotipado y ser insuficiente al no especificar los apartamentos que habrían de ser registrados. **Atendiendo estos únicos planteamientos**, el Tribunal de Instancia (Hon. José Rodríguez Arenas) celebró vista evidenciaria en la que testificaron el agente José Rivera González, el Alguacil José R. Betancourt Pomales, la Sra. Iris Jaelis Crespo Carrasquillo y la Sra. Carmen Melecio. Estas últimas, residentes de la edificación allanada. Luego de escuchar esta prueba y adjudicar credibilidad, el tribunal **denegó la supresión**. Los acusados acudieron al Tribunal de Circuito de Apelaciones (Hons. Arbona Lago, Negroni Cintrón, y Salas Soler). **No solicitaron, gestionaron ni elevaron Exposición Narrativa de la Prueba conforme el trámite procesal reglamentario**. Descansaron exclusivamente en una argumentación unilateral de cómo habían ocurrido los hechos y en unas fotografías. El Tribunal de Circuito **confirmó** en virtud de un examen de las fotocopias de fotos de la estructura, y dictaminó correctamente —obviamente con vista a la ausencia de la Exposición Narrativa— que **de las constancias de autos no surgía suficiente información que les permitiera concluir que el dictamen de Instancia fuera claramente erróneo**. Más aún, resolvió que la determinación de instancia estaba fundamentada en la excepción autorizada en <u>Pueblo</u> v. <u>Pérez Narváez</u>, 130 D.P.R. 618 (1992).

**Aún así, repetimos, sin el beneficio de una Exposición Narrativa de la Prueba, la mayoría revoca y emite un dictamen basado en un cuadro fáctico especulativo, calcado del presentado por los acusados en su escrito.**

II

La **única prueba** que consta en autos susceptible de ser evaluada por este tribunal es la declaración jurada del agente investigador José M. Salgado y copias de las fotos de la estructura allanada. Más allá, sólo contamos con los resúmenes, de su faz incompletos, de los acusados

y el Procurador General (no Exposición Narrativa) sobre los testimonios vertidos en la vista de supresión de evidencia. Examinémosla.

**A. Declaración Jurada y Fotografías:-**

El 12 de junio de 1996 el agente Salgado prestó declaración jurada ante la Juez Municipal, Hon. María J. Buso Aboy, del Tribunal de Bayamón, para la orden de registro y allanamiento de la residencia antes aludida. Relató que para finales del mes de mayo recibió una llamada telefónica anónima en la que le indicaban que en la mencionada carretera, luego del negocio "El Regreso Pub & B.B.Q.", a mano izquierda en dirección a la Carr. 875 se encontraban dos residencias, una de una planta color rosa Núm. 838 y **la otra de tres niveles, incluyendo un sótano color crema**, Núm. 837 en donde se dedicaban a la venta y procesamiento de sustancias controladas y al trasiego de armas de fuego. El 9 de junio, alrededor de las 11:00 a.m., el agente Salgado se dirigió al lugar para continuar la investigación comenzada días antes. Estacionó el vehículo oficial sin rotulación frente a la residencia de tres niveles. Observó a un joven portando una bolsa mediana transparente con envases cilíndricos pequeños que en su interior contenían un polvo blanco que se dirigía a la residencia de un nivel donde entregó la bolsa a una señora en una bata azul de flores, a través de una reja. Luego de salir del vehículo, el agente observó al mismo joven sacar de una guagua "Dodge", una escopeta recortada y un rifle, meter ambas armas dentro de una bolsa plástica de basura y dirigirse a la residencia de tres niveles donde llamó varias veces a un individuo por el nombre de Toño. Un individuo salió por la puerta de un balcón en el segundo nivel y preguntó al joven qué le había traído, a lo que éste respondió que le había traído la ropa que había pedido. El individuo en el balcón le dio las gracias y le indicó que bajaría. Entró y salió por la parte de abajo de la residencia en dónde el joven le entregó la bolsa que contenía las armas. Posteriormente, el agente corroboró la parte posterior de la residencia por donde salió el

individuo que se asomó al balcón y advirtió que había un sótano con puertas de entrada que dan acceso al interior de la residencia.

Coincidimos con la mayoría de que el relato jurado por el agente Salgado no fue estereotipado ni insuficiente. Narró detalladamente una sucesión de eventos con gran particularidad, y como declaración jurada era suficiente para establecer "causa probable" y justificar la orden de registro y allanamiento.

Aún así, la mayoría invalida la orden por alegada falta de especificidad al **concluir** que el agente Salgado debió haber investigado la **posibilidad** de que la estructura a registrarse fuera de ocupación múltiple. Nos dice que "de los autos no surge que el agente haya realizado una investigación razonable para determinar si en efecto la estructura multipisos era destinada para residencia de ocupación múltiple. (Opinión, págs. 22-23). **Se trata de una exigencia irrazonable e improcedente en las dimensiones procesal y sustantiva**. Precisamente, por no haber sido preparada ni elevada una **Exposición Narrativa de la Prueba** por los acusados, es que la mayoría injustamente puede afirmar que los autos están huérfanos sobre este extremo. Ignora así que no era al Procurador General que le correspondía suplir esa información "en los autos". Como existía una orden judicial, ese deber corresponde a los acusados y éstos no lo descargaron.

En lo sustantivo, conforme **ilustran los anejos** unidos a esta ponencia y puede el lector corroborarlos, desde la Carr. Núm. 845 la estructura exterior tenía todas las características de ser unifamiliar. **Las fotos presentadas reflejan ausencia de estacionamientos, buzones o listado de residentes en el exterior de la residencia**. También se observa **un sólo portón** para la entrada vehicular y peatonal. **Tanto Instancia como Circuito al examinar las fotos, concluyeron que la estructura no aparentaba ser dedicada a vivienda de ocupación múltiple**.

No existió pues indicio alguno que provocara duda en los agentes sobre el tipo de ocupación unifamiliar en la residencia en cuestión. Es absurdo exigirle al agente Salgado que investigara la posible

naturaleza multifamiliar de una estructura que externamente no presentaba características ni muestras de serlo. Como bien dice la mayoría, **la obligación de realizar una investigación razonable para determinar si la estructura que será registrada con orden es de ocupación múltiple** <u>**sólo surge cuando la configuración física de ésta**</u> <u>**sugiere razonablemente que la misma es de ocupación múltiple**</u>. (Opinión, pág. 19). Esa no es la situación ante nos.

Por otro lado, las fotos tomadas desde la parte posterior presentan puertas y números que identifican diferentes apartamentos. También puede apreciarse en una de las fotos la base vacía de un contador, mientras que en otra se observa una base con lo que aparentan ser dos contadores.

Respecto a los números, el Ministerio Público argumentó que muy bien pudieron haber sido colocados después del Registro. **La defensa no presentó prueba testimonial, fotográfica, o de otra índole para demostrar la existencia de números en las puertas durante el registro, ni de contadores independientes, completos y en funcionamiento que evidenciaran tomas y sistemas residenciales separados de energía eléctrica.**

Como sabemos, en situaciones en que el allanamiento en controversia se realiza en virtud de una orden judicial, corresponde al promovente de la moción de supresión demostrar que el registro y la incautación de la evidencia fue irrazonable y, por consiguiente, ilegal. <u>Pueblo</u> v. <u>Maldonado Rivera</u>, res. en 25 de marzo de 1994; <u>Pueblo</u> v. <u>Vázquez Méndez</u>, 117 D.P.R. 170 (1986).

**B. Testimonios Vertidos en Vista Evidenciaria:-**

La Opinión mayoritaria expone que de los resúmenes testificales de las partes —no están completos— surge que los apartamentos fueron registrados de **forma consecutiva**. Desconocemos la fuente para esta conclusión. **Esta descripción de los hechos no surge de los testimonios según presentados por los acusados y el Procurador.** Resulta imposible

inferir de estos resúmenes el orden, si alguno, en que se llevaron a cabo los registros.

**Por el contrario, si algo revela el resumen del testimonio del agente Rivera González presentado en la petición de certiorari por los propios acusados es simultaneidad:**

> "Le entregan una orden de registro o allanamiento con unas instrucciones verbales de registrar un sótano, llega al lugar con ayuda de sus compañeros. Este indica que si llega a ir sólo se 'aguantaría' y no haría el registro, porque la estructura se ve de dos niveles y la orden dice de tres. Admite que podría allanar 'los apartamentos que fueran'. Realizó el registro porque iba acompañado del identificador, que lo ayudó a llegar. Además le dijeron que primero registrara el sótano. **Mientras realizaba el registro en el apartamento D-4, en el apartamento vecino se llevaba a cabo otro allanamiento por otros compañeros.** Que desde el frente de la estructura 837 no era posible ver el estacionamiento en la parte posterior, ni el sótano, el cual no se conecta por dentro de ninguno de sus apartamentos contiguos ni del apartamento A-1 donde se encontró el material delictivo." (Enfasis nuestro).

En contraposición a lo establecido por la mayoría, de este testimonio, insistimos, se infiere **simultaneidad** en el diligenciamiento de la orden, lo cual, como veremos, es el elemento fáctico crucial y determinante para la correcta adjudicación sobre la validez del registro.

De otra parte, surge también de la petición de <u>certiorari</u> que el Alguacil Betancourt sólo testificó que había visitado los diferentes apartamentos para diligenciar. Debido a esas varias visitas y haber durante la mismas penetrado en la estructura, no tuvo problemas en distinguir que eran apartamentos diferentes. Ciertamente, que estaba familiarizado con el lugar, ya que había realizado citaciones en el edificio en tres o cuatro ocasiones anteriores. La Sra. Crespo atestó que residía en el apartamento D-4 y que a eso de las tres de la madrugada del día de los hechos unos policías se presentaron a su apartamento y lo registraron. La Sra. Melecio, residente del apartamento E-5, testificó que en esa misma madrugada, entre 3:00 y 3:30 a.m., le ocurrió lo mismo. **En vista de estos escuetos testimonios, ¿cómo puede la mayoría concluir de forma categórica que los registros**

**se llevaron de forma consecutiva?** Si algo reflejan las alegaciones y versiones (carecemos de una Exposición Narrativa de la Prueba), es lo contrario.

**Si llevamos a ultranza nuestra objetividad judicial, la verdad es que los autos no nos permiten conocer cómo se llevó a cabo el diligenciamiento de la orden.** Sin el beneficio de la Exposición Narrativa de la Prueba, ¿qué versión fáctica debe utilizarse para resolver? Los apartamentos muy bien pudieron haber sido registrados simultáneamente o de forma consecutiva. Tampoco podemos determinar si el apartamento donde se encontró el material delictivo fue el primero o el último de los registrados. ¿Cómo entonces puede la mayoría, sin una **Exposición Narrativa de la Prueba**, concluir que fue **consecutivo y anular el registro**?

Suscribimos la norma de que una vez los agentes se percatan de la "naturaleza estructural del lugar" deben descontinuar el registro. También, que es ilegal todo registro efectuado luego haber advenido en tal conocimiento. **El problema surge cuando la aplicamos a este caso sin tener toda la prueba.** Con la rapidez que caracteriza de ordinario este tipo de allanamiento y registro, ¿en qué momento los agentes descubrieron la naturaleza multifamiliar de la estructura? ¿Habían ya encontrado el material delictivo? **Nuevamente la mayoría hace caso omiso a la máxima de que los hechos determinan el derecho.** Si el registro del apartamento donde se encontró el material delictivo se llevó a cabo primero que los demás o se registraron simultáneamente, la evidencia obtenida sería admisible de haber sido incautada antes de conocerse la naturaleza multiresidencial de la estructura. No obstante, de la declaración jurada y fotos contenida en autos resulta imposible determinar la verdadera forma en que ocurrieron los hechos. Sobre todo, cuando los acusados no cumplieron con su obligación de elevar una Exposición Narrativa de la Prueba –instrumento necesario, de utilidad incuestionable– para una evaluación correcta de los hechos en controversia. In re Cruz González, 123 D.P.R. 108 (1989). Al no cumplir

con su obligación, los acusados renunciaron a que el Tribunal de Circuito y este foro pasaran juicio sobre la credibilidad que el Tribunal de Instancia confirió a la prueba testifical.

III

Sobre el registro del remolque, caracterizado hábilmente como "vagón-residencia", la mayoría parte del supuesto equivocado de que no existió una orden judicial válida, por lo que los agentes, sin motivos fundados, carecían de facultad en ley para registrarlo.

Conforme el escueto cuadro fáctico plagado de lagunas insalvables, no podemos suscribir esa conclusión. **Según señalado, del mismo análisis formulado por la mayoría se desprenderse la validez de la orden de registro**. Esto, unido a la falta de prueba sobre lo ocurrido durante el diligenciamiento de la orden, imposibilita la supresión de la evidencia obtenida.

**Primero, no existían señas exteriores algunas que llevaran a los agentes a creer que el remolque estaba siendo utilizado como residencia independiente.** Si algo revelan las fotos en evidencia, es que el remolque se encontraba estacionado, tenía sus neumáticos en buenas condiciones; no hay indicio alguno de que se estuviese utilizando como una unidad de vivienda. **Segundo, no hay prueba testifical que sugiera que se usaba como residencia.** Sólo los argumentos de su abogado. Es principio rector que meras alegaciones y teorías, como tampoco argumentos forenses, constituyen prueba. **Tercero**, el coacusado Alemán Colón, tampoco presentó prueba alguna de que su registro fuese efectuado después del de los apartamentos. Descansó exclusivamente en la alegación de invalidez de la orden, **por lo cual los argumentos mayoritarios resultan improcedentes y especulativos.**

IV

Recapitulando. De la escasa prueba disponible para ser examinada y tomada en cuenta por este Tribunal, —declaración jurada del agente Salgado y fotos— resulta imposible siquiera inferir, **sin Exposición Narrativa**, dos de las premisas básicas de la mayoría, a

saber, que existió en este caso una obligación de investigar si la vivienda era de ocupación múltiple y que el registro fue realizado de manera consecutiva.

No podemos pues refrendar la revocación de los dictámenes de Instancia y Circuito. La magra prueba presentada ante nos por los acusados no sustenta el cuadro fáctico alegado en su escrito; aún así la mayoría decide tomar esa versión de los hechos como cierta y procede a resolverles favorablemente. Como bien señaló Circuito en su Sentencia, –al igual que nos pronunciáramos en Pueblo v. Colón Bernier, supra,– no estamos prejuzgando los méritos de la cuestión planteada. Simplemente, no se nos ha puesto en posición de revocar el dictamen de instancia sobre la validez del registro. Los acusados, quienes tenían el peso de la prueba, no suplieron información suficiente que nos lleve a precisar un cuadro claro sobre lo que ocurrió durante el diligenciamiento de la orden en controversia.

En ausencia de error manifiesto o indicios de prejuicio, pasión o parcialidad, no debemos intervenir con las determinaciones del tribunal sentenciador, sobre todo cuando no se ha elevado una Exposición Narrativa de la Prueba. Benítez Guzmán v. García Merced, 126 D.P.R. 302 (1990).

**Este Tribunal no sólo se equivoca al suprimir la evidencia, sino que por segunda ocasión, al utilizar la versión de los hechos según presentados por los acusados, menoscaba la necesidad en el futuro del uso de la Exposición Narrativa, para reproducir durante el trámite apelativo los testimonios presentados en los foros de instancia, mecanismo indispensable para una justa apreciación apelativa de los hechos.**

Se trasciende los límites constitucionales permisibles en nuestra función judicial revisora.

ANTONIO S. NEGRÓN GARCÍA
Juez Asociado